[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13811
_____

D.C. Docket No. 6:16-cv-00167-JRH-GRS

AKEEM WASHINGTON,

Plaintiff-Appellee,

versus

SHANNON R. RIVERA,
in her individual capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(September 25, 2019)

Before NEWSOM and ANDERSON, Circuit Judges. *

_____

* After oral argument, Judge Branch recused herself and did not participate in this decision, which is rendered by a quorum.  28 U.S.C. § 46(d).

ANDERSON, Circuit Judge:

In this case involving an alleged Fourth Amendment violation, Shannon Rivera ("Rivera") appeals from the district court's conclusion that she is not entitled to quasi-judicial immunity, qualified immunity, and Georgia official immunity from Akeem Washington's ("Washington") 42 U.S.C. § 1983 and state law claims. We have reviewed the briefs, the record, and the relevant case law, and have heard from the parties at oral argument. We conclude that Rivera is not entitled to quasi-judicial immunity or Georgia statutory immunity. But we conclude that Rivera's actions did not violate Washington's clearly established rights, and that she is thus entitled to qualified immunity. We will therefore affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND[1]

In August 2011, Washington was issued a speeding ticket. He appeared before Judge Jack Carney of the State Court of Bryan County, Georgia, on October 10, 2011, to resolve that ticket. At the hearing, Judge Carney verbally announced that Washington was guilty of speeding and imposed an $895 fine. Rivera, a probation officer for the Bryan County Sheriff's Office, attended the hearing.

---

[1] These facts are drawn from Washington's third amended complaint, which we take as true and view in the light most favorable to Washington. Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

Washington was not carrying enough cash to immediately pay the fine, but told Judge Carney in Rivera's presence that he would go get enough cash to pay. Judge Carney told Washington that he would not be on probation if he paid his fine by October 25, 2011. Rivera heard this exchange. The clerk of court wrote a note specifying the payment deadline and noting to call Rivera if Washington paid. Washington left the courtroom to use an ATM and immediately paid the fine at the clerk's office that same day.

The Deputy Clerk, Regina Curl, wrote Washington a receipt noting his payment in full. Curl called Bryan County's Probation Office "[i]n accordance with the verbal instructions of" Judge Carney and spoke with Regina Ellis, who worked there with Rivera. Curl told Ellis that Washington had paid his fine and asked Ellis to tell Rivera. But Ellis did not tell Rivera. Curl updated the clerk's office database to reflect Washington's full payment of his fine a few days later.

On January 11, 2012, someone[2] filed a document in the clerk's office sentencing Washington to probation. The next month, Rivera signed an arrest warrant for Washington, to be submitted to Judge Carney. Ellis notarized and Judge Carney signed the warrant, which stated that Washington had not paid his fine. Between the date of Washington's payment and the date when Rivera signed

---

[2] Washington's complaint does not say who.

the arrest warrant, Rivera did not check with Washington, Curl, or Ellis to confirm that Washington did not pay his fine.

On September 29, 2012, Washington was arrested pursuant to the warrant. He was sent to Bryan County Jail, where he told the Sheriff's office personnel that he had paid his fine. Someone at the Sheriff's office notified Rivera that Washington had been arrested and was claiming that he had already paid. Rivera then confirmed that Washington had paid his fine and authorized his release. Washington was released from custody. Washington's employer, the Georgia Department of Corrections, then fired Washington from his job due to the arrest.

Washington filed suit in state court against Shannon Rivera and Regina Ellis in their individual capacities, alleging that he was unlawfully arrested under Georgia law.[3] When he amended his complaint to add a § 1983 claim, which alleged that he was deprived of his protection from unreasonable seizure and arrest under the Fourth Amendment, the defendants removed to federal court. Rivera moved for judgment on the pleadings on Washington's third amended complaint, arguing that she is thrice immune from suit under the doctrines of quasi-judicial immunity and qualified immunity and the Georgia Tort Claims Act ("GTCA").

---

[3] Ellis is not a party on appeal, and the claims against her are still pending in the district court.

The district court denied her motion, holding that Rivera was not entitled to either type of immunity or the GTCA's protections.  Rivera appealed.[4]

## II. STANDARD OF REVIEW

We review the district court's denial of a motion for judgment on the pleadings de novo.  Perez, 774 F.3d at 1335.  Judgment on the pleadings is appropriate when no material facts are in dispute and the movant is entitled to judgment as a matter of law.  Id.

## III. ANALYSIS

### A. Quasi-Judicial Immunity

Rivera first invokes quasi-judicial immunity, arguing that her status as a state probation officer entitles her to absolute immunity from Washington's § 1983 claim.

Quasi-judicial immunity grants protection from suit to officials who are "intimately associated with the judicial phase of the criminal process."  Hughes v. Chesser, 731 F.2d 1489, 1490 (11th Cir. 1984) (quoting Spaulding v. Nielsen, 599 F.2d 728, 729 (5th Cir. 1979)).[5]  We determine whether a government employee deserves quasi-judicial immunity through an analysis of that employee's functions,

---

[4] Rivera can appeal the district court's order immediately under the collateral order doctrine. Nixon v. Fitzgerald, 457 U.S. 731, 742–43, 102 S. Ct. 2690, 2697–98 (1982) (holding that denials of absolute immunity are immediately appealable); Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985) (extending Nixon to qualified immunity).

[5] Fifth Circuit cases decided before October 1, 1981, are binding precedent in this circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc).

5

and "not . . . the status of the defendant." Cleavinger v. Saxner, 474 U.S. 193, 201, 106 S. Ct. 496, 501 (1985) (internal quotations omitted). We do not look to rank, title, or location within the government, but rather examine "the nature of the responsibilities of the individual official" to determine whether the official was exercising a sufficiently judicial function. Id.; see also Spaulding, 599 F.2d at 729 (extending quasi-judicial immunity to a federal probation officer because the "narrow function" at issue (i.e. the preparation and submission of a presentence report to a judge in a criminal case) was "intimately associated with the judicial phase of the criminal process," and noting that when "the challenged activities of a federal probation officer are within this function," she has absolute immunity (emphasis added)).[6]

Our lodestar in this case is Malley v. Briggs, 475 U.S. 335, 106 S. Ct. 1092 (1986). In Malley, the Supreme Court did not grant quasi-judicial immunity to a defendant police officer who applied for arrest warrants. Id. at 343, 106 S. Ct. at 1097. The officer analogized his actions to those of a prosecutor who asks a grand jury to indict a suspect; such a prosecutor has quasi-judicial immunity. He noted that an officer must review the evidence before him and exercise a discretionary function based on that evidence, like the prosecutor. Id. at 341–42, 106 S. Ct. at

---

[6] Even judges—the obvious example of persons with a judicial status—do not have absolute immunity when acting outside of the judicial function. See Forrester v. White, 484 U.S. 219, 227–29, 108 S. Ct. 538, 544–45 (1988).

1096.  And he argued that an officer applying for a warrant will likewise not exercise his best judgment if he fears retaliatory lawsuits.  Id.

The Court found this comparison "untenable."  Id. at 342, 106 S. Ct. at 1097.  It held that the police officer's act of applying for an arrest warrant is not "intimately associated with the judicial phase of the criminal process," Imbler v. Pachtman, 424 U.S. 409, 430, 96 S. Ct. 984, 995 (1976), and is "further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment," Malley, 475 U.S. at 342–43, 106 S. Ct. at 1097.  It concluded that the officer applying for a warrant, unlike a prosecutor seeking an indictment, is not a "central actor in the judicial process" and thus not entitled to absolute immunity.  Id. at 343, 106 S. Ct. at 1097.

We can see little daylight between the police officer's functions in Malley and Rivera's functions here.  There is no material difference between a police officer applying for an arrest warrant and a probation officer seeking such a warrant.  Both officers act on their own initiative and not at a judge's direction.  And both perform a function that we would characterize as investigative rather than one having "an integral relationship with the judicial process."  Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994) (internal citations and quotations

7

omitted).[7]  We thus hold that, because the Supreme Court in Malley concluded that

a police officer's application for a warrant was not sufficiently judicial to receive

quasi-judicial immunity, Rivera's action here cannot receive it either.

We note that our decision brings us in line with most other circuit courts to

have considered the issue. Most circuits have not extended absolute immunity to

probation officers in related circumstances.  See Swift v. California, 384 F.3d

1184, 1191–93 (9th Cir. 2004) (parole officials are not entitled to absolute

immunity for investigating parole violations and orchestrating an arrest); Mee v.

Ortega, 967 F.2d 423, 429 (10th Cir. 1992) (parole official is not entitled to

absolute immunity for initiating the arrest of plaintiff and holding him in jail

pending revocation hearing); Wilson v. Rackmill, 878 F.2d 772, 776 (3d Cir. 1989)

(parole officers not entitled to absolute immunity when challenged functions

include investigating parole violations and drafting warrant applications because

these functions are "executive and investigative," not "adjudicatory"); Ray v.

Pickett, 734 F.2d 370, 373 (8th Cir. 1984) (probation officer not entitled to

---

[7] It matters little that, at the time of the office's creation, county probation officers served in a position created under the ambit of a Chief Judge.  O.C.G.A. § 42-8-100(g)(2) (repealed June 30, 2015).  The Supreme Court has dictated that we apply a functional or conduct-based analysis, and not a status-based analysis, in determining whether to extend quasi-judicial immunity.  Currently, the probation office is organized and operated by the county (although Georgia probation offices are still created "[u]pon the request of the chief judge of any court within a county and with the express written consent of such judge").  O.C.G.A. § 42-8-101(a)(2).  The fact that the office was initiated by the state judicial system may—at most—render the probation officer's actions slightly more judicial.  But it cannot transform the function of Rivera's actions from investigative or administrative to judicial.

absolute immunity for falsifying a report to obtain a warrant for a parole violator);

Galvan v. Garmon, 710 F.2d 214, 215–16 (5th Cir. 1983) (probation officer not

entitled to absolute immunity for mistakenly filing an arrest warrant); see also

Johnson v. R.I. Parole Bd. Members, 815 F.2d 5, 8 (1st Cir. 1987) (extending

immunity to a parole board member while noting that "[w]e believe that the

function of an arresting parole officer is more akin to that of a police officer and

sufficiently distinguishable from the quasi-judicial duties performed by a parole

board member").[8]

Thus, we conclude that the conduct at issue here—a Georgia probation

officer applying for an arrest warrant—is not the kind of conduct entitled to

absolute, quasi-judicial immunity.[9]  Instead, qualified immunity's more

circumscribed protections are enough to protect officers, when appropriate, in

Rivera's situation.  See Burns v. Reed, 500 U.S. 478, 486–87, 111 S. Ct. 1934,

1939 (1991) (presuming that in most instances, "qualified rather than absolute

---

[8] Rivera cites to Dorman v. Simpson, 893 F. Supp. 1073 (N.D. Ga. 1995), for the proposition that "federal probation officers should be accorded absolute immunity for their function in issuing violator warrants."  Id. at 1082.  We note that district court opinions are not binding precedent. Camreta v. Greene, 563 U.S. 692, 709, 131 S. Ct. 2020, 2033 n.7 (2011).  We also note that the Dorman opinion did not cite the Supreme Court's decision in Malley v. Briggs.  In any event, our discussion today addresses only the appropriate immunity for Georgia parole officers.

[9] Rivera argues that she is entitled to quasi-judicial immunity under Georgia law, and that Georgia law and federal law are the same in this regard.  We reject Rivera's claim under Georgia law for the same reasons we reject her claim under federal law.

immunity is sufficient to protect government officials in the exercise of their duties"). We turn to that analysis now.

## B. Qualified Immunity

Rivera argues that even if she cannot obtain absolute immunity, she can invoke the protections of qualified immunity.[10] Qualified immunity "requires courts to enter judgment in favor of a government employee unless the employee's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Morse v. Frederick, 551 U.S. 393, 429, 127 S. Ct. 2618, 2640 (2007) (internal citations and quotations omitted).[11]

To overcome Rivera's qualified immunity defense, Washington must show that Rivera (1) violated a constitutional right (here the Fourth Amendment protection against unreasonable seizure and arrest), and (2) that the violated right

---

[10] While we usually analyze qualified immunity after a party files for summary judgment, it can be considered on a motion to dismiss. See St. George v. Pinellas Cty., 285 F.3d 1334, 1337 (11th Cir. 2002). Dismissal on qualified immunity grounds is proper when the "complaint fails to allege the violation of a clearly established constitutional right." Id. (internal citations and quotations omitted). Appellate review is "limited to the four corners of the complaint." Id. "Once an officer has raised the defense of qualified immunity, the burden of persuasion on that issue is on the plaintiff." Id.

[11] There was some dispute below as to whether Rivera was performing a "discretionary function," a requirement of her invoking qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Washington has not argued on appeal that Rivera was not acting within her discretionary authority. We would conclude anyway that Rivera's act of seeking an arrest warrant for a probation violator was within the scope of her discretionary duties, and that she was thus "performing a function that, but for the alleged constitutional infirmity, would have fallen within [her] legitimate job description." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004) (emphasis omitted).

10

was "clearly established." See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199–1200 (11th Cir. 2007). We can address these issues in either order. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). Because we conclude that Washington cannot show a violation of a clearly established Fourth Amendment right, we assume arguendo that Rivera violated the constitutional right and turn to the issue of whether that right was clearly established.

A right is clearly established when the right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citation omitted). We have noted that "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases" and that "awareness of the existence of an abstract right . . . does not equate to knowledge that [a defendant's] conduct infringes the right." Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc) (internal citations and quotations omitted). What matters is "whether the state of the law gave the defendants fair warning that their alleged conduct was unconstitutional." Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (internal citations and quotations omitted). As discussed below,

11

Washington points to only two Eleventh Circuit cases in his effort to demonstrate that Rivera violated clearly established Fourth Amendment law. That is, he relies on Eleventh Circuit case law extant at the time of Rivera's actions as having provided fair warning to Rivera that her actions were unconstitutional.[12]

The two cases on which Washington relies both involve a fairly egregious set of facts, ostensibly establishing a clearly established right. In Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004), a woman was involved in a car accident with an off-duty officer. She told the officers that she was dizzy from the crash and that she had sustained head injuries. She failed a field sobriety test and was taken into police custody. She was accused first of driving under the influence of alcohol, but after several breathalyzer tests all showed no alcohol in her bloodstream, she was accused of driving under the influence of cannabis. After the breathalyzer tests showed no alcohol, an officer writing a report on the incident was told to write that Kingsland smelled strongly of cannabis; he discarded the report he had been drafting and started a new one. Kingsland took a urine drug test and was charged with driving under the influence of cannabis. Although twenty officers were on the scene, none asked Kingsland or her two passengers for their

---

[12] The possibility exists that an officer's conduct "so obviously violate[d] [the] constitution that prior case law is unnecessary." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005); see also Corbitt v. Vickers, 929 F.3d 1304, 1312 (11th Cir. 2019). Washington does not argue that Rivera's conduct fits within this exception, and we conclude that, even assuming that it did violate the Constitution, that violation was not so obvious that prior case law is unnecessary.

12

version of the incident.  By contrast, the officers spent a great deal of time talking to the other driver, who was their fellow officer.  He told them that Kingsland had run a red light, notwithstanding that Kingsland had told him immediately after the wreck that it was he who had run the red light; at the time, she thought he was an investigatory officer responding to the scene.  And the officers did not search Kingsland's vehicle, although they later claimed that they smelled cannabis coming from the vehicle and Kingsland's breath.  No drug-sniffing dogs were summoned.

When the urine test came back negative, the charges were dropped. Kingsland then sued for false arrest and malicious prosecution.  Id. at 1223–25.

We held that the officers were not entitled to qualified immunity.  Officers "should not be permitted to turn a blind eye to exculpatory information that is available to them."  Id. at 1228.  And officers may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts, such as whether there was cannabis in the truck or whether witnesses were available to attest to who was at fault in the accident."  Id. at 1229.  While an officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest . . . an officer may not choose to ignore information that has been offered to him or her."  Id. (internal citations and quotations omitted).  We concluded that a jury could find the officers' investigation was "deficient in that

13

the officers consciously and deliberately did not make an effort to uncover reasonably discoverable, material information." Id. at 1230.  We also concluded that genuine issues of fact remained as to whether the officers "fabricated or unreasonably disregarded certain pieces of evidence." Id. at 1233.

Washington also directs us to Tillman v. Coley, 886 F.2d 317 (11th Cir. 1989).  In Tillman, an officer purchased marijuana from a woman in her mid-twenties who called herself "Mary Tillman."  The sheriff overseeing the operation knew a "Mary Tillman" in her early forties who lived near the undercover buy. The sheriff took no steps to determine if the Mary Tillman he knew was the same woman who sold marijuana to the undercover officer.  Three months later, the Mary Tillman the sheriff knew was arrested solely to identify whether she was the marijuana-dealing Mary Tillman; in other words, instead of investigating to resolve the discrepancy between the ages of the suspect identified by the undercover officer and the Mary Tillman the sheriff knew, the sheriff simply had Mary Tillman arrested in order to see if she was the marijuana-selling suspect.  She was interviewed at the county jail and stated she was not the person from whom the officer had bought marijuana.  The sheriff told Mary Tillman she could leave, at which point she fainted and was hospitalized. Id. at 318–19.

We denied qualified immunity, holding that while the sheriff "was not required to investigate every claim of innocence raised by Tillman . . . he was

14

required to investigate his own serious doubts regarding the suspect's identity." Id. at 321.  We concluded that a "reasonable police officer would have been sufficiently concerned by the age discrepancy of a generation to make further investigation," and that "[b]ecause of the doubts he harbored, Sheriff Coley's actions were not reasonable." Id.

We review the facts of this case to better see whether any constitutional rights violated here could have been clearly established by Kingsland or Tillman. In the courtroom, and with Rivera present, Washington stated that he would pay his fine to the clerk's office that same day, a "common practice," according to the complaint.  Part and parcel of that common practice is that once the clerk's office receives that payment, it would notify the probation office that the fine had been paid.  Judge Carney stated in the courtroom that the clerk's office should call the probation office upon payment.  So there was an expectation, verbally articulated in the courtroom, that the clerk's office would inform the probation office of Washington's payment.  Rivera was privy to this expectation, because she was in the courtroom and because it was the common practice.[13]

---

[13] At oral argument, Washington's counsel contended for the first time that Rivera would not have known about the expectation that the clerk's office would inform the probation office of payment, because this expectation was merely noted on the court calendar and not shared with Rivera.  The fact that the complaint states that the communication of the payment to the probation office was part of "common practice," and that it was "[i]n accordance with the verbal instructions" of Judge Carney, shows that this new contention is inconsistent with the allegations of the complaint.

15

Thus, while she prepared the arrest warrant, Rivera already possessed a piece of information: that when Washington paid his fine, Rivera was supposed to be notified. The fact that she was not notified reasonably led her to believe that Washington had not paid his fine. She waited a period of time for an exculpatory event to happen. That event's nonoccurrence was itself—from Rivera's perspective at least—inculpatory evidence. This is not, then, a situation in which the defendant officer engaged in "no investigation," as the district court concluded. Drawing a logical inference from facts you possess constitutes at least *some* examination of the evidence at hand.

It is perhaps true that it would have been better for Rivera to have called the clerk's office. Not doing so—and not immediately discovering available exculpatory evidence—may well have been negligent.[14] But this is not a case in which Rivera possessed some inculpatory evidence and some exculpatory evidence, and rendered herself willfully blind to the latter while devoting herself to believing in the former.[15] Rivera only had evidence of nonpayment. She did not have any information that would give rise to serious doubts about Washington's

---

[14] The complaint does not allege that Rivera had a consistent practice of checking with the clerk's office that a fine had not been paid before drafting a warrant application. Instead, the complaint states that Rivera had "often" and "frequently done so in the past."

[15] Rivera had not, for example, been told by a friend in the clerk's office that someone named "Washington" had recently paid a fine for speeding. That would have brought this case close to Tillman.

16

guilt.  She did not deliberately ignore proffered evidence of innocence.  Her failure—if she did in fact commit a constitutional violation—was not that she ignored relevant evidence and conducted her investigation in a biased manner; rather, she merely relied on the clerk's office to tell her if Washington paid his fine, and failed to double check with that office to confirm what she already believed.

We conclude that these facts, as alleged, are not materially similar to the facts of Kingsland or Tillman.  Neither case clearly establishes that every failure by an officer to discover "easily discoverable facts" violates the Fourth Amendment.  382 F.3d at 1229.  Rather, Kingsland makes clear that officers cannot "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts."  Id. (emphasis added).  It states that officers "may not choose to ignore information that has been offered to him or her."  Id. (emphasis added).  And it notes that a jury could find that the officers' failure to uncover easily discoverable information was "conscious[] and deliberate[]," id. at 1230, and could find that the officers fabricated evidence.  Id. at 1233.  See also Huebner v. Bradshaw, __F.3d__, 2019 WL 3948983 (11th Cir. August 2019) (similarly distinguishing Kingsland as a case with "jarring" facts).

Tillman, too, makes clear that an officer cannot be willfully blind to known facts that are exculpatory and give rise to "serious doubts."  866 F.2d at 321.  In

17

other words, an officer cannot ignore facts that would give a reasonable officer "sufficient[] concern[s]." Id.

Thus, in both Kingsland and Tillman, the defendant officers consciously ignored information they already possessed that cast significant doubt on whether a defendant was guilty. In Kingsland, the officers took no investigative measures, even though the evidence they possessed did not give rise to the narrative they included in their report and used to arrest the plaintiff. In Tillman, the sheriff willfully disregarded a large incongruity between what he knew about the suspect and what his undercover officer had told him. In both cases, the defendants possessed information giving rise to an exculpatory inference, and did nothing to examine "easily discoverable facts" that would confirm or contradict that inference. [16]

But the complaint here does not allege that Rivera intentionally disregarded pertinent exculpatory information about Washington. Because she never received a phone call indicating that Washington had paid his fine, she already possessed

---

[16] Washington also points to Cozzi v. City of Birmingham, 892 F.3d 1288 (11th Cir. 2018). There, the defendant officer arrested a suspect on the basis of four pieces of weakly probative evidence while ignoring a tipster's statement that the suspect had one tattoo, while the perpetrator had numerous tattoos up and down his arm. Id. at 1292–93. The defendant "failed to look at or inquire about the tattoo" before arresting the suspect, thereby "unreasonably disregard[ing]" a "readily verifiable exculpatory fact." Id. at 1294, 1297. We view Cozzi as a straightforward application of Kingsland, and it does not change our view that Kingsland materially differs from this case. In any event, Cozzi was decided after the incident at issue in this appeal took place, and thus could not have served as "clearly established law" of which Rivera should have known.

18

evidence that he had not paid.  And she possessed no information that Washington had in fact paid.  We cannot say that a review of the case law would have indicated to her that the Constitution required further investigation to confirm that the evidence she possessed was accurate.

Instead, the situation as alleged in this case is closer to the facts of Post v. City of Fort Lauderdale, 7 F.3d 1552 (11th Cir. 1993).  There, agents inspecting a restaurant improperly arrested the restaurant's owner for a building code violation. The agents had determined that the crowd at the restaurant exceeded its maximum capacity, but had apparently counted customers incorrectly during their head count. We held that a "mistaken but reasonable count" established arguable probable cause.  Id. at 1558.  The court in Kingsland distinguished its own scenario from that in Post, noting that "the agents in Post simply made a good faith mistake, whereas here, the officers' conduct creates factual issues as to their honesty and credibility."  382 F.3d at 1233.  The court concluded that "a reasonable mistake in the legitimate performance of [the officers'] duties" ought to be protected by qualified immunity.  Id.; see also Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.") (internal quotations omitted); Malley v. Briggs, 475 U.S. 335, 343, 106 S. Ct. 1092, 1097

19

(1986) (the qualified immunity standard provides "ample room for mistaken judgments").

We conclude that Kingsland's description of Post also describes Rivera's conduct here: a reasonable mistake in the legitimate performance of her duties. A reasonable officer in Rivera's position could have believed that her actions were lawful. Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002). We conclude that Rivera's alleged conduct did not violate clearly established Fourth Amendment law; accordingly, she is entitled to qualified immunity.

## C. State Statutory Immunity

The Georgia Tort Claims Act provides immunity to a "state officer or employee who commits a tort while acting within the scope of his or her official duties or employment." O.C.G.A. § 50-21-25(a). But the Act expressly excludes "counties" from its definition of "State." Id. § 50-21-22(5). Rivera, as an employee of the Bryan County Sheriff's Office, works for the county—so it would appear that the Act does not grant her immunity from Washington's state-law claims.[17]

---

[17] Washington's third amended complaint expressly alleges that Rivera is an employee of the Bryan County Sheriff's Office. Although Rivera's answer denies this allegation, she did not present either evidence or argument in the district court challenging the fact of her employment in the Sheriff's Department. The district court determined that Rivera was employed by the Sheriff's Office, and Rivera does not challenge that on appeal.

20

But Rivera argues that she was acting in her capacity as a probation officer, and so acting on behalf of the state—specifically, the State Court of Bryan County. And under the Act, a person is a "state officer or employee" if she is "acting on behalf or in service of the state in any official capacity." Id. § 50-21-22(7).

We think, ultimately, that Georgia courts would hold that Rivera, operating as a probation officer employed by the Bryan County Sheriff's Office, cannot earn the GTCA's protections. In Nichols v. Prather, 650 S.E.2d 380 (Ga. Ct. App. 2007), the Georgia Court of Appeals held that sheriffs are county officials and are not protected by the GTCA. Id. at 384. The Georgia Constitution "specifically states that sheriffs are 'county officers' who are elected by the voters of their respective counties." Id. Also, the Georgia Tort Claims Act "specifically excludes counties," id. (citing O.C.G.A. § 50-21-22(5)), and it "follows that the GTCA's definition of 'state officer or employee' excludes county officers and employees," id. "[B]ased upon the Georgia Constitution [and] the GTCA . . . we conclude that . . . neither the sheriff nor his employees are state officers or employees under the GTCA." Id. at 385 (internal citations and quotations omitted); cf. Crosby v. Johnson, 779 S.E.2d 446, 449 (Ga. Ct. App. 2015) (holding that coroners are county officials, not state officers, and thus not entitled to immunity). This holding in Nichols is compelling evidence that Rivera's actions are, on the whole, taken on behalf of or in service of the county, and not the state.

21

Rivera directs us instead to Huzzie v. State, 558 S.E.2d 767 (Ga. Ct. App. 2002), which stated that a probation officer—even one employed by a private corporation—operates as an officer of the court when filing a petition for revocation of probation, and thus was not engaged in the unauthorized practice of law.  Id. at 768–69.  But Huzzie analyzed probation officers in a different context, did not interpret the text of the GTCA, and provides little guidance as to whether, and in what circumstances, a county probation officer "act[s] on behalf or in service of" the state in the context of Georgia Tort Claims immunity.  O.C.G.A. § 50-21-22(7).

Huzzie, quoting an earlier case, does state that a probation officer "[acts] as a State agent in the preparation and filing of [a] petition for revocation of . . . probation."  558 S.E.2d at 768 (quoting Leverette v. State, 546 S.E.2d 63, 64 (Ga. Ct. App. 2001)) (emphasis added; other alterations in original).  Rivera uses this language to argue that she is also a "State agent."  But Leverette concerned a probation officer employed by the state itself.  546 S.E.2d at 64.  And Huzzie's holding ultimately does not conclude that the private probation officer acted as a "State agent," but rather relies on Leverette to conclude only that the officer was an "officer of the court."  Huzzie, 558 S.E.2d at 768–69.  A person can of course be an "officer of the court" while not acting as a "State agent"—a private attorney, for

22

example.  So we do not think Huzzie supports the proposition that probation officers are "State agents" for purposes of Georgia Tort Claims immunity.

Nichols's holding that sheriffs and their employees are county officials, coupled with the nature of Rivera's challenged actions, leads us to conclude that there is no official immunity.[18]  Rivera acted on her own initiative in preparing Washington's arrest warrant.  She was acting in an investigative or administrative manner for the sheriff's office.  Thus, she was acting on the county's behalf, and not "acting on behalf or in the service of the state."  O.C.G.A. § 50-21-22(7).  We therefore hold that Rivera is not entitled to GTCA immunity.[19]

## IV. CONCLUSION

In conclusion, we hold that Rivera is not entitled to absolute, quasi-judicial immunity from Washington's claims because her action of applying for an arrest warrant was too far removed from core judicial functions.  But she is entitled to qualified immunity from his federal claims because there is no law clearly establishing that her actions were unconstitutional.  Finally, she is not entitled to

---

[18] Again, we do not think the fact that the probation office was established at the request of the Chief Judge of the Bryan County State Court moves the needle.  See O.C.G.A. § 42-8-100(g)(2) (repealed June 30, 2015).  Nothing in the statutory scheme indicates that probation services are considered actions taken on behalf of the state court.  The statute, in fact, states that probation services will be "a county probation system."  Id.

[19] We need not decide whether, or under what circumstances, a county employee might be deemed to be acting on behalf of or in the service of the state.  We hold only that Rivera, with respect to the particular function challenged here, was not.

23

immunity from Washington's state-law claims under the Georgia Tort Claims Act by that statute's terms.  The district court's order denying Rivera's motion to dismiss is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

**AFFIRMED IN PART**, **REVERSED IN PART**, and **REMANDED**.