[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11994

_____

TIMOTHY ALLEN DAVIS, SR.,

Plaintiff-Appellant,

*versus*

CITY OF APOPKA,

Defendant-Appellee

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:15-cv-01631-RBD-LRH

_____

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

During a domestic dispute, Timothy Allen Davis, Sr. shot his unarmed twenty-two-year-old son, killing him. He was arrested and prosecuted for murder but was acquitted after a jury trial. Davis then filed a lawsuit against the City of Apopka, Florida and some of its police officers. He asserted a 42 U.S.C. § 1983 claim that he was arrested without probable cause, a Florida state law claim for false arrest based on the same contention, and a § 1983 claim that the officers' search of his home violated his Fourth Amendment rights.

The search claim was tried to a jury, but before that trial the district court dismissed the federal and state arrest claims under Federal Rule of Civil Procedure 12(b)(6). Davis challenges those rulings, based on his contention that the operative complaint shows that after his wife called 911 to report that her husband shot their son, the three officers who were dispatched to the scene of the shooting should have believed Davis when he said that he had acted in self-defense. The complaint also claims that if the officers didn't believe him, they should have conducted a more thorough investigation before making the arrest.

On the § 1983 claim that the officers had searched his house in violation of the Fourth Amendment, the jury returned a verdict in favor of the City. Davis challenges the denial of his motion for

a new trial on that claim based on the failure to give a municipal liability jury instruction that he requested.

Before we get to the facts as alleged in the complaint, we need to point out a few more procedural aspects of the case. First, the officers involved in the search and arrest are no longer parties. They were dismissed after Davis settled with them. The City is the only remaining defendant. Davis' position is that the City is liable for the conduct of its Chief of Police because he was the final policymaker, and he personally and directly participated in the arrest and the search of Davis' home. The City does not deny that Chief Manley was the final policymaker, although it vigorously denies that there is any liability, insisting that none of Davis' claims is valid.

This is not the first time this case has been before our Court. See Davis v. City of Apopka, 734 F. App'x 616 (11th Cir. 2018) (unpublished). In the first appeal, Davis argued that the district court had erred in dismissing his arrest claims. A panel of this Court remanded the case for the district court to address in the first instance Davis' argument that, in light of Florida's "Stand Your Ground" law, Fla. Stat. §§ 776.012(2), 776.032, the officers lacked actual probable cause to arrest him because his use of deadly force was legally justified. Davis, 734 F. App'x at 621–22.

On Davis' § 1983 unlawful search claim, the panel concluded that Chief Manley "was a final policymaker such that his order to search Davis' home without a warrant rendered the City liable

absent any established custom or practice." *Id.* at 619.  The panel determined:

> The district court, rather than addressing Davis's allegation that the warrantless search was conducted upon the direction of the Chief of Police, addressed and rejected Davis's alternative allegation that the City had a custom of improper training or permitting the Chief of Police to override established protocols and standard operating procedures.  But Davis stated a claim for relief against the City based on a single decision by a final policymaker.

*Id.* at 620.

On remand, the district court followed this Court's mandate.  It determined that there was actual probable cause to support Davis' arrest and that even in light of Florida's Stand Your Ground law, the facts as alleged did not "*conclusively establish* the sufficiency of the defense [of self-defense] so as to negate probable cause in the context of a false arrest claim."  (The court did not believe that the absence of self-defense was an element of murder under Florida law.)  The district court once again dismissed Davis' § 1983 and state law claims that the officers arrested him without probable cause.

The case was tried on the § 1983 claim that the search of his home violated Davis' rights under the Fourth Amendment.  The jury returned a verdict in favor of the City, finding that Chief Manley did not knowingly direct, participate in, adopt or ratify the unlawful search of Davis' home.  Davis filed a motion for a new trial,

contending that, among other things, the district court had erred in refusing to give a jury instruction on a custom and policy theory of municipal liability. The court denied that motion. Among the reasons for the denial was its interpretation of our mandate as casting out of the case Davis' custom and policy theory of municipal liability, leaving only the "final policymaker" basis for potential liability. The district court's decision not to give the requested custom and policy jury instruction is Davis' only basis for challenging the denial of his motion for a new trial.

We will first address Davis' § 1983 and state law claims that he was arrested without probable cause.

## I.  THE DISMISSAL OF THE FEDERAL AND STATE WRONGFUL ARREST CLAIMS

We review *de novo* the district court's Rule 12(b)(6) dismissal of Davis' federal and state claims involving the arrest. *McGroarty v. Swearingen*, 977 F.3d 1302, 1306 (11th Cir. 2020). In doing so, we "accept[] the factual allegations in the complaint as true and constru[e] them in the light most favorable to" Davis. *Id.* (quotation marks omitted).

### A.  What the Complaint Does and Does Not Allege

Davis' third amended complaint is the operative one. It alleges that on the night of October 1, 2011, his wife called 911 and reported that her husband "had had a confrontation with their son and that she believed her husband had shot" him. The complaint does not allege that Ms. Davis told the 911 operator then, or told

6                    Opinion of the Court                    20-11994

any of the responding officers when they arrived at the scene, that the shooting had been in self-defense or that her husband had to shoot their son Timmy to protect himself.

The complaint does allege that before the shooting occurred that night, Davis and Timmy had gotten into a heated argument outside their home.  Timmy walked off down the street but returned home about fifteen minutes later and continued to argue with his father, who was trying to calm him down.  In the upstairs bathroom, the fight turned physical.  Timmy tackled Davis and repeatedly punched him.  Ms. Davis broke up the fight between her husband and son.  Davis then went downstairs but was followed by Timmy.  In hopes of scaring Timmy off, Davis "limped out of the garage and retrieved his firearm from his vehicle that was parked in the driveway."

According to his complaint, Davis was afraid, panicked, and fired a shot at Timmy, who was walking toward him.  The complaint alleges that Davis fired the first "shot in Timmy's direction to scare him off," and then because that did not appear to work, Davis fired again with a different intent.  The complaint states that Davis "fired a second time in self-defense."  That necessarily means that Davis is alleging that he fired the second shot deliberately, allegedly with the intent to stop Timmy from seriously wounding or killing him.  *See* Fla. Stat. § 776.012(2) (providing that a person's use of deadly force is justified if that person reasonably believes his deliberate action is "necessary to prevent imminent death or great bodily harm to himself").  Davis does not allege that he acted

accidentally in self-defense, if there even is such a thing. He doesn't contend that he did not intend for his second shot to strike Timmy and seriously injure or kill him.

And the second shot that Davis fired did hit Timmy in the chest, mortally wounding him.

When they arrived at the scene a few minutes after Ms. Davis' 911 call on the evening of October 1, the officers found Davis in the driveway, lying on top of Timmy.[1] Timmy was bleeding from the chest. Davis had bruises and was bleeding, too, but he had not been shot. It was apparent that the two men had been in a fight and that the only one of them who had been shot was Timmy.

When an officer asked Davis who had shot Timmy, Davis responded, "I did because my son beat me up and kept coming at me." When the officer asked Davis where the gun was, he answered that it was in his front pants pocket. The officer handcuffed

---

[1] A "few minutes" after Ms. Davis' 911 call, two officers from the Apopka Police Department arrived at the Davis home, and "[w]ithin minutes" of their arrival the Chief of Police joined them there. The rank of the officers does not alter the standard for determining whether there was probable cause to arrest Davis. *See Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) ("[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity.'") (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018)). For that reason and for ease of reference, we describe the chief and the two officers who responded to the 911 call as "the officers."

Davis and took the gun from his pocket. While that was happening, Timmy yelled at the officers, "Get away from daddy and leave my daddy alone!"

Some neighbors had come over to the Davis house after they heard loud noises. Two of them knew that Davis and Timmy had argued outside the house, and thirty minutes later they had heard two gunshots, but it is undisputed that no neighbor witnessed the shooting or the events occurring immediately before it.

The complaint acknowledges that while at the scene, one of the officers noticed a camera affixed to the garage and asked Davis: "I see you got cameras up here. Do they work?" Davis replied, "Yeah they do." But the effort to obtain video evidence was thwarted through no fault of the officers. When asked if the cameras recorded, Davis answered: "Nah, it don't record because I had the DVR hooked up to my computer and when the computer broke down and I got it fixed, I forgot to re-program [the DVR] back to my computer." (Brackets in original.) The complaint does not allege that any surveillance camera recorded the shooting or the fight leading up to it.

There is not now, nor has there ever been, any allegation in the complaint or elsewhere that Ms. Davis saw any part of the shooting itself. The allegation is that she saw "Timmy on the ground *after* he had been shot." (Emphasis added.) The only two people the complaint alleges actually saw the shooting were Davis the shooter and Timmy the shooting victim.

The complaint alleges that Ms. Davis was interviewed by an officer sometime the day after the shooting. During that interview she stated that before Davis shot Timmy, the two of them had been arguing and fighting upstairs in the home; Timmy was getting "progressively nastier and more vulgar"; and he had pushed his father. She heard Davis scream that his knees had been hurt. (It was a re-injury. Sometime before that night his knees had been injured seriously enough on his job that he had retired.)

But the complaint does not allege that Ms. Davis told any officer at any time that when Davis went downstairs and got his gun and shot Timmy, Timmy had done anything that would have justified Davis shooting him. She could not have known if Davis shot Timmy in self-defense or out of anger or in retribution for the blows Timmy had inflicted on him while they were fighting. She was upstairs when Davis went downstairs. There is no allegation that she saw Davis get his gun out of his car that was parked in the driveway. She did not see him fire the first shot or the second one. She could not have known if the shooting was in self-defense. What she did know is what she told the 911 operator, which is that Davis "had a confrontation with their son" and then shot him.

Timmy died at the hospital at 12:36 a.m. on October 2, 2011, about six hours after Davis had shot him. Following Timmy's death, Davis was formally charged with first degree murder "in Orange County Felony Case Number 48-2011-CF-013424 in the State of Florida."

10                     Opinion of the Court                   20-11994

The complaint is not clear about whether the officers actually arrested Davis at the scene on the evening of October 1 or sometime on October 2, after he had been taken to the hospital and interviewed further. Viewed in the light most favorable to Davis, the allegations are that he was arrested the evening of October 1 at the scene where he shot Timmy, not afterwards while he was at the hospital.[2] That is, and apparently always has been, Davis' position. So for purposes of the probable cause analysis, that will be our position, too.[3]

### B. The Governing Probable Cause Principles

The existence of probable cause is an absolute bar to a § 1983 claim of false arrest, *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990), and to a claim of false arrest under Florida law,

---

[2] Davis remained at the hospital from the evening of October 1, 2011 until on or about October 7, 2011 when he was discharged and taken into custody at the Orange County Jail. He was released from jail on October 22, 2011, and remained on "home confinement" until February 14 or 15, 2013, when he was acquitted of the charge of murdering Timmy.

[3] Probable cause is measured at the time of the arrest, not at some time before or after. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *see also, e.g.*, *United States v. Leonard*, 4 F.4th 1134, 1146 (11th Cir. 2021) ("Probable cause is based on what a reasonable officer would think at the time of arrest — not on what they could understand with the benefit of hindsight."); *Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019) (assessing probable cause based on the facts known or available to the officers "at the time of the arrest"); *United States v. Gonzalez*, 969 F.2d 999, 1003 n.6 (11th Cir. 1992) (same).

*Bolanos v. Metro. Dade Cnty.*, 677 So. 2d 1005, 1005 (Fla. 3d DCA 1996).

Probable cause is "a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quotation marks omitted). It is "incapable of precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). A good place to begin a discussion of it is with a statement that Chief Justice John Marshall made a couple of centuries ago in *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813). The Supreme Court quoted that statement with approval in *Illinois v. Gates*: "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion." 462 U.S. 213, 235 (1983).

Over the years caselaw has added some well-established principles to reinforce and refine Chief Justice Marshall's definition of the term. One important principle that the Supreme Court has stressed is: "Probable cause is not a high bar." *Wesby*, 583 U.S. at 57 (quotation marks omitted); *accord Kaley v. United States,* 571 U.S. 320, 338 (2014). We have ourselves held that probable cause "does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, *or even a finding made by a preponderance of the evidence.*" *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (emphasis added).

That is important because the preponderance standard, where it applies, means that the evidence must make a given fact or conclusion more likely true than not true. *See United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (en banc). Because probable cause requires less than a preponderance of the evidence, it necessarily follows that probable cause does not require that it be more likely than not the person arrested for a crime is actually guilty of it.

After all, probable cause can survive an acquittal. *See, e.g.*, *Hill v. California*, 401 U.S. 797, 804 (1971) (holding that the Fourth Amendment's reasonableness requirement was not violated by an arrest based on probable cause, even though the officers arrested the wrong person); *Anderson v. Creighton*, 483 U.S. 635, 663–64 (1987) (Stevens, J., dissenting) ("Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved."); *see also Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted — indeed, for every suspect released."); *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (same).

This Court has quoted with favor Judge Learned Hand's wise observation that "the 'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to

be so cut down that they cannot possibly perform their duties." *Marx*, 905 F.2d at 1507 (quoting *United States v. Heitner*, 149 F.2d 105, 106 (2d Cir. 1945) (Hand, J.) as quoted in *Draper v. United States*, 358 U.S. 307, 312 n.4 (1959)); *accord, e.g., Von Stein v. Brescher*, 904 F.2d 572, 578 n.9 (11th Cir. 1990) ("'Probable cause' defines a radically different standard than 'beyond a reasonable doubt,' and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction."); *United States v. Pantoja-Soto*, 739 F.2d 1520, 1524 n.7 (11th Cir. 1984) (same).

Probable cause exists if the totality of the circumstances known to the officers could persuade a reasonable officer that there is a "substantial chance of criminal activity" by the person who is arrested. *Wesby*, 583 U.S. at 57. A substantial chance is all that is required, "not an actual showing of such activity." *Id.*; *see also Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (holding that the correct standard to evaluate whether an officer had probable cause to arrest a suspect is to "ask whether a reasonable officer *could* conclude that there was a substantial chance of criminal activity") (alteration adopted) (emphasis added) (quoting *Wesby*, 583 U.S. at 61).

Probable cause is not a technical concept that only the legally trained can apply. Actually, it's designed to be just the opposite. The Supreme Court has reminded us that: "On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Pringle*, 540 U.S. at 370 (quotation marks omitted); *see also Florida v. Harris,* 568 U.S. 237, 244 (2013); *Gates,* 462 U.S. at 231 ("Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'") (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

That means evidence of every element of a crime is not required for a showing of probable cause. *See Adams v. Williams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."); *Gates*, 884 F.3d at 1300; *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) ("No officer has a duty to prove every element of a crime before making an arrest."). We have never imposed "a rigid requirement that an arresting officer must have specific evidence" of suspects' "subjective intent" when their conduct "otherwise gives rise to probable cause to arrest." *Gates*, 884 F.3d at 1300; *Jordan*, 487 F.3d at 1355 ("[N]o police officer can truly know another person's subjective intent."); *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) (holding that evidence of intent was not required for probable cause to arrest for passing or possessing counterfeit money). We have pointed out that arrests are different from criminal prosecutions, and "[p]olice officers are not expected to be lawyers or prosecutors." *Jordan*, 487 F.3d at 1355 (quotation marks omitted). And "officers are not required to perform error-free investigations or

independently investigate every proffered claim of innocence." *Kingsland,* 382 F.3d at 1229 n.10.

Neither are officers expected to be judges. It is not unusual to find at the scene of a crime evidence pointing in different directions, but "[a] law enforcement officer is not required to resolve every inconsistency found in the evidence." *Paez,* 915 F.3d at 1286. That is especially true because on-the-scene officers are often "hampered by incomplete information and forced to make a split-second decision between action and inaction." *Crosby v. Monroe Cnty.,* 394 F.3d 1328, 1334 (11th Cir. 2004); *see also Ryburn v. Huff,* 565 U.S. 469, 477 (2012) (reversing a court of appeals in an exigent circumstances case for "not heed[ing] the . . . wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene," and for not following the Court's instructions that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving") (second alteration in original) (quotation marks omitted). The Supreme Court has been unequivocal about that. So has this Court.

For example, last year we had before us a § 1983 case raising a Fourth Amendment claim that the probable cause supporting an arrest pursuant to a warrant "was later undermined by contrary exculpatory evidence." *Howard,* 25 F.4th at 898. The perpetrator was shown a photograph of the plaintiff and identified her as a partner in the crime. *See id.* at 894–95. The plaintiff alleged that after

she was arrested, the perpetrator saw her in person at the jail and told the investigating officer that the plaintiff was *not* the woman who had committed the crime with him. *See id.* at 895. We acknowledged that his later statement, if true, was exculpatory as to the plaintiff, but held that the officer "was not required to believe it or to weigh the evidence in such a way as to conclude that probable cause did not exist." *Id.* at 902. We emphasized that "a police officer need not resolve conflicting evidence in a manner favorable to the suspect." *Id.*

In the same vein, when officers are making a probable cause determination they simply are not required "to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 583 U.S. at 61; *see also Howard*, 25 F.4th at 902 (quoting *Wesby*, 583 U.S. at 61). We have been nothing if not consistent about that rule. Thirty-three years ago we held in our *Marx* decision that "[the officers] were not required to forego arresting [the plaintiff] based on initially discovered facts showing probable cause simply because [he] offered a different explanation." 905 F.2d at 1507 n.6. And we employed that same holding in our *Huebner* decision four years ago. *See* 935 F.3d. 1183, 1188.

We are not alone. That same important principle about probable cause is the law of other circuits. *See Loftin v. City of Prentiss*, 33 F.4th 774, 781 (5th Cir. 2022) ("A suspect's declaration of innocence is not a fact supporting a defense. And a soon-to-be arrestee's naked assertion of self-defense under these circumstances does not vitiate probable cause. Otherwise, every suspect

for a litany of violent crimes could avoid, or delay, arrest by simply proclaiming self-defense.") (footnote omitted); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1221 (10th Cir. 2020) ("Even a plausible explanation does not require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.") (citation and quotation marks omitted); *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.") (cleaned up); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (explaining that an officer is not required to "explore and eliminate" every plausible claim of innocence before making an arrest once he has "a reasonable basis for believing there is probable cause") (quotation marks omitted); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (holding that although the arresting officer could have believed the plaintiff's version of events, claiming self-defense, he was not obligated to believe the plaintiff's assertions that he was acting in self-defense or "make a full investigation into plaintiff's state of mind prior to taking action"); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (While an officer can take a suspect's explanation into consideration in deciding whether he has probable cause, the officer "is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.") (citation omitted).

This widespread, bedrock principle of probable cause law is particularly relevant in violent crime cases like this one where, as the Florida Supreme Court has pointed out, "suspects will often claim self-defense even when the facts would not appear to support such a claim." *Kumar v. Patel*, 227 So. 3d 557, 560 (Fla. 2017). Given that, and "considering the well-established body of law detailing the responsibilities of law enforcement officers," the Florida Supreme Court decided that, regardless of what the state's Stand Your Ground statute says, the reality is that officers cannot be expected to make on-the-spot self-defense determinations at the scene of a violent crime before deciding whether to make an arrest. *See id.* A more particular self-defense determination will have to await later proceedings, or as the Florida Supreme Court has put it, "a *post*-arrest and *post*-charging immunity determination [of the self-defense issue] . . . will be the best that we can do." *Id.* (emphasis added).

Some of the most volatile circumstances that officers face and some of the most difficult decisions that they must make are on the scene in domestic violence cases. Probable cause determinations in that context often present special challenges coupled with the need for quick action to sort things out, to get the wounded medical treatment, and to protect everyone's safety.

The First Circuit explained it well: Deference to on-the-spot, reasonable judgments made by officers "may be particularly warranted in domestic disputes" because they "require police to make particularly delicate and difficult judgments quickly" and

"violence may be lurking and explode with little warning." *Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir. 1999); *see also Terrell v. Larson*, 396 F.3d 975, 979 (8th Cir. 2005) ("Domestic disturbances are notoriously volatile and unpredictable . . . .") (quotation marks omitted); *see generally Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) ("Police officers conduct approximately 29,000 arrests every day — a dangerous task that requires making quick decisions in circumstances that are tense, uncertain, and rapidly evolving.") (quotation marks omitted); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953 (2018) ("There are on average about 29,000 arrests per day in this country. Dept. of Justice–FBI, Uniform Crime Report, Crime in the United States, 2016 (Fall 2017)). In deciding whether to arrest, police officers often make split-second judgments.").

The touchstone of the Fourth Amendment is reasonableness, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), and we have stressed that in assessing whether officers acted reasonably "it's not our role to armchair quarterback the officers' decision," *United States v. Cooks*, 920 F.3d 735, 742 (11th Cir. 2019); *cf. Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016) ("[I]n reviewing probable cause determinations . . . the role of the courts is not that of the much-maligned 'Monday morning quarterback' . . . ."). In this area, "we cannot indulge 'the 20/20 vision of hindsight.'" *Cooks*, 920 F.3d at 742 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Graham*, 490 U.S. at 396 (explaining that the "reasonableness at the moment" standard applies in several Fourth

Amendment contexts, including the probable cause to arrest calculus).

Pragmatic deference in reviewing the actions of the men and women on the front lines of law enforcement is not a new concept. A half century ago the D.C. Circuit explained that: "Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine philosophical concept existing in a vacuum, but rather it requires a pragmatic analysis of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972) (citation and quotation marks omitted). Pragmatic deference was behind the Supreme Court's instruction just five years ago that when reviewing an officer's decision to arrest a suspect, we must avoid engaging in an "excessively technical dissection of the factors supporting probable cause." *See Wesby*, 583 U.S. at 60 (quotation marks omitted).

Given the principles applicable to probable cause determinations, it is little wonder that the Supreme Court has summarized it this way: "The probable cause decision, by its nature, is hard to undermine, and still harder to reverse." *Kaley*, 571 U.S. at 339 (discussing the standard in the context of a grand jury's finding of probable cause). This is not one of those exceedingly rare cases where the probable cause decision is undermined to the point of reversal.

### C.  Is the Absence of Self-Defense an Element or Is Its Existence an Affirmative Defense, and Does it Matter in this Case?

Davis contends that Florida's Stand Your Ground law changed the probable cause calculus.  He argues that because of that statute self-defense is no longer an affirmative defense under Florida law, but instead the absence of it is a requirement for probable cause to exist at the time of the arrest.  In other words, he suggests that arresting officers must treat the absence of self-defense as an element of the crime of murder.  *See generally Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010) ("Whether an officer possesses probable cause . . . depends on the elements of the alleged crime and the operative fact pattern.").

Florida's Stand Your Ground law, first enacted in 2005 and amended in 2014, provides: "A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself . . . ."  Fla. Stat. § 776.012(2).  That person is also "immune from criminal prosecution" for the use of such deadly force.  *Id.* § 776.032(1).  The statute defines "criminal prosecution" to include "arresting, detaining in custody, and charging or prosecuting the defendant."  *Id.*; *see Dennis v. State*, 51 So. 3d 456, 462 (Fla. 2010) ("Section 776.032(1) expressly grants defendants a substantive right to not be arrested, detained, charged, or prosecuted as a result of the use of legally justified force.").  And particularly important here, the statute prohibits an officer from arresting a person for using force "unless [the officer]

22                    Opinion of the Court                    20-11994

determines that there is probable cause that the force that was used or threatened was unlawful." Fla. Stat. § 776.032(2).

In *Rankin v. Evans*, which came before the enactment of Florida's Stand Your Ground law, we held that "[t]he existence of probable cause constitutes *an affirmative defense* to the claims of false arrest and imprisonment under Florida law." 133 F.3d 1425, 1436 (11th Cir. 1998) (emphasis added). But with a § 1983 claim of false arrest, "plaintiffs had the burden of demonstrating the absence of probable cause in order to succeed" on that claim. *Id.*

Certain statements from the Florida Supreme Court's opinion in *Kumar v. Patel*, 227 So. 3d 557 (Fla. 2017), which came well after the Stand Your Ground Act became part of Florida law, appear to support Davis' position that self-defense is no longer just an affirmative defense. But as Davis recognizes, those statements were dicta. The question in the *Kumar* case was not about the existence of probable cause or the role it plays in a Stand Your Ground proceeding in a criminal case. The sole issue in *Kumar* was "whether an immunity determination pursuant to the Stand Your Ground law in a criminal proceeding controls in a civil proceeding." 227 So. 3d at 558. That is the only issue on which the Court reached a holding. *See id.* at 561 ("hold[ing] that the Stand Your Ground law does not confer civil liability immunity to a criminal defendant who is determined to be immune from prosecution in the criminal case").

In the course of discussing the legislative intention to provide for immunity from arrest as well as prosecution, the *Kumar*

20-11994                Opinion of the Court                    23

opinion contains this lengthy passage, which is quoted here in its entirety because some statements in it are best understood in context:

> In both criminal and civil proceedings, the determination of whether a defendant is entitled to Stand Your Ground immunity has been made at pretrial evidentiary hearings where the defendant must prove that the immunity attaches by a preponderance of the evidence. [*Dennis*, 51 So. 3d at] 460 (criminal case); *Pages v. Seliman–Tapia*, 134 So. 3d 536, 538 (Fla. 3d DCA 2014) (civil case). We recognize that a pretrial hearing cannot afford the immunity purportedly guaranteed by the plain language of this statute in the criminal context, for the simple reason that there appears to be no way to do so in most cases.
>
> For example, the statute purports to grant immunity from arrest, detention, and prosecution. § 776.032(1), Fla. Stat. But, in many situations, it would be impossible for law enforcement to secure a judicial immunity determination prior to arresting an individual suspected of killing or causing bodily harm to another (or attempting to do so). The law is clear that we expect officers to temporarily detain a person encountered under circumstances creating a reasonable suspicion of criminal activity. § 901.151, Fla. Stat. (2017). Then, *if there is probable cause to believe that the person committed a felony, law enforcement is authorized to immediately effectuate the arrest,* under section 901.15, Florida Statutes (2017), *and should*

*clearly do so when there is probable cause to believe that a person has committed a serious crime of violence against another.  Cf.* § 907.041(4)(c)5., Fla. Stat. (2017) (authorizing pretrial detention by court order when a suspect poses a risk of physical harm to the community).  *Probable cause to arrest for a crime of violence would include probable cause to believe that the suspect was not acting in self-defense; and, suspects will often claim self-defense even when the facts would not appear to support such a claim.  This means that in most potential self-defense cases, a post-arrest and post-charging immunity determination, made when a defendant's counsel requests that determination, will be the best that we can do — procedurally — considering the well-established body of law detailing the responsibilities of law enforcement officers*, prosecutors, and judges.

227 So. 3d at 559–60 (emphasis added) (footnote omitted).

That passage can be read in two ways.  One way to read it is that because "[p]robable cause to arrest for a crime of violence *would* include probable cause to believe that the suspect was not acting in self-defense," *id.* at 560 (emphasis added), the absence of self-defense is an element of the crime.  Which is to say that the language could be interpreted as meaning that the absence of self-defense is an element of murder under Florida law.  But the Court's use of the word "would" raises some doubt about that interpretation.  Why add a modal auxiliary verb?  Why say "would include" instead of the more straightforward "includes"?

One possible reason for using the tentative *would* is that the Court was rejecting the interpretation in which the absence of self-defense *must* be an element at the probable-cause-to-arrest stage. That interpretation is made more plausible by the very next thing the Court says, closely joined by a semi-colon, which is that "suspects will often claim self-defense even when the facts would not appear to support such a claim." *Id.* As a result, the reasoning goes, "in most potential self-defense cases, a post-arrest and post-charging immunity determination" of the self-defense issue "will be the best that we can do — procedurally — considering the well-established body of law detailing the responsibilities of law enforcement officers." *Id.*

To put it less formally, the Florida Supreme Court may have been saying in the *Kumar* passage that it knows what the Act literally says, but that approach simply won't work in "most" cases. And because it won't, the self-defense determination in most cases must be made after arrest, which is when decisions about affirmative defenses are generally made. *See, e.g.*, *Paez*, 915 F.3d at 1286 ("[A]n affirmative defense to an alleged crime does not necessarily vitiate probable cause."); *Manners v. Cannella*, 891 F.3d 959, 972 (11th Cir. 2018) (holding that the plaintiff's argument about the unconstitutionality of the fleeing and eluding provision of a Florida statute was "an affirmative defense, not one the officer was required to consider at the outset of this encounter" during an attempted traffic stop); *State v. Riehl*, 504 So. 2d 798, 800 (Fla. 2d DCA 1987) ("In order to establish the probable cause necessary to

make a valid arrest, however, it is not necessary to eliminate all possible defenses."); *see also Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002) (stating that in the probable cause determination for arrest, a "police officer is not required to inquire into facts and circumstances in an effort to discover if the suspect has an affirmative defense"). The absence of self-defense ordinarily is not an element of a violent crime to be determined at the time of arrest.

It's a close question whether the Stand Your Ground Act changed Florida law so that instead of self-defense being an affirmative defense, the absence of it became an element of every violent crime in which self-defense is claimed. But we don't have to decide that question. Even if Florida's Stand Your Ground law makes the absence of self-defense an element of murder, an officer could have reasonably concluded — based on the facts known to the officers at the scene of the arrest — that probable cause existed to believe that Davis did not shoot his son in self-defense. *See Jordan*, 487 F.3d at 1355 ("No officer has a duty to prove every element of a crime before making an arrest."). Davis' allegations about what the officers saw and heard, the credibility determinations that they made, and the nature and extent of the investigation they conducted (or failed to conduct) do not plausibly state a claim that they lacked probable cause for an arrest.

### D.  The Complaint Fails to State a Claim that the Officers Lacked Probable Cause

Davis contends that the facts alleged in his complaint show that the officers lacked probable cause to arrest him. He argues

that they deliberately turned a blind eye to exculpatory evidence supporting his self-defense claim. We disagree. Based on the alleged facts known to the officers at the time of the arrest and the totality of circumstances they encountered when they arrived at the scene, there was probable cause to arrest Davis there.

### 1. What the Officers Knew

According to Davis, no reasonable officer could have thought there was probable cause to believe that the shooting was not justified by self-defense. He bases that contention in large part on his assertion that "the *only* evidence" the officers had when they arrested him was that he had claimed self-defense and he had some visible injuries.

That assertion is unfounded, as the allegations in the complaint show. The inculpatory evidence began with Ms. Davis' 911 call that summoned officers to the scene of a shooting. She did not simply make a 911 call and ask that officers be sent to her house. She did not say, for example, "Send some officers, we have a problem." Or even, "Send some officers, we've had a shooting." Instead, what she told the 911 operator is, in the words of the complaint, "that Mr. Davis had had a confrontation with their son and that she believed her husband had shot" him. She did not tell the 911 operator that her husband had to shoot her son or that the shooting was in self-defense. It has never been alleged that she said anything like that in the 911 call or to the officers when they arrived at the scene or at any other time.

The fact that Ms. Davis' 911 call arose from a domestic dispute and that she described the events leading up to the shooting as Mr. Davis having "had a confrontation with their son" is telling. She did not report that their son had a confrontation with her husband but just the opposite. The content of her 911 call was significant inculpatory evidence. Or so an officer reasonably could believe.

The inculpatory evidence continued to pile up once the officers arrived at the scene minutes after the 911 call. They found Timmy on the ground with Davis lying on top of him. Not under him, not beside him, but on top of him. They found that Timmy, who was unarmed, had been shot in the chest. The officers also found that Davis had in his pocket the pistol he had used to shoot Timmy. And Davis admitted to the officers that he had shot Timmy.

Of course, Davis claimed that he had fired the fatal shots in self-defense. We say "of course" because many of those who shoot others during or after confrontations claim that they did so in self-defense. *See Kumar*, 227 So. 3d at 560 ("[S]uspects will often claim self-defense even when the facts would not appear to support such a claim."). It is an easy claim to make, especially when the only other eyewitness to the shooting is dead or dying.

Davis' argument that the officers were required to accept his self-serving claim of self-defense or to hold off on arresting him because he made that claim flouts common sense, and more importantly, runs contrary to the holdings of the Supreme Court and

this Court.  As we have already discussed, the Supreme Court and this Court have consistently held in decisions spanning more than thirty years that where the initial facts show probable cause, officers are not required to forego making an arrest because the suspect offers an innocent explanation for those facts.  *See supra* at 15–16 (discussing the *Wesby*, *Howard*, *Huebner*, and *Marx* decisions). Officers are not required to believe what the suspect says or to launch into an investigation of his claim.  *See supra* at 14–16.  Other circuits agree with that principle.  *See supra* at 16–17.

Based on the totality of the circumstances, an officer reasonably could have concluded that there was a substantial chance that the shooting Davis confessed to was unlawful.  *See Wesby*, 583 U.S. at 61 (The test for probable cause is whether "a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity.") (emphasis added) (quotation marks omitted); *accord, e.g.*, *Howard*, 25 F.4th at 902.  That is enough.

### 2.  Davis' Blind Eye Argument

According to Davis, the officers "ignored evidence" that his use of deadly force "may have been justified."  He asserts that they "turned a blind eye to obvious and easily preservable evidence" that would have led any reasonable officer to believe that there was no probable cause to arrest Davis because he was the real victim. He argues that an officer may not choose to ignore exculpatory evidence that has been offered.  True enough, as a general principle. But we see no blindness.  Davis' complaint points to none.  He never specifies who offered what exculpatory evidence to which

officer; nor does he explain how, if that evidence is considered, no reasonable officer could have believed there was a substantial chance that Davis had committed a crime. All of the so-called "exculpatory" evidence that Davis argues was ignored either was not ignored, or points in both directions, or points in no relevant direction, or otherwise falls short of negating probable cause when considered in light of other allegations and undisputed evidence.

As we said in *Washington v. Rivera*, "this is not a case in which [the officer] possessed some inculpatory evidence and some exculpatory evidence, and rendered herself willfully blind to the latter while devoting herself to believing in the former." 939 F.3d 1239, 1248 (11th Cir. 2019) (footnote omitted). Our *Washington* opinion acknowledged that the officer may have been negligent in her investigation, *see id.*, but we found that "[s]he did not deliberately ignore proffered evidence of innocence." *Id.* We distinguished cases in which "officers consciously ignored information they already possessed that cast significant doubt on whether a defendant was guilty." *Id.* And we concluded that the plaintiff in *Washington* had failed to show a violation of a clearly established Fourth Amendment right. *Id.* at 1245, 1249.

Maybe Davis believes that the officers in this case turned a blind eye (or a deaf ear) to Timmy's alleged demand, as the officers were taking the pistol from his father's pocket and handcuffing him: "Get away from daddy and leave my daddy alone!" But that remark does not sweep away the totality of the circumstances supporting probable cause. The words Timmy is alleged to have said

after being shot do not change the facts that he was indisputably unarmed, that Davis was indisputably the shooter, and that Davis indisputably shot Timmy in the chest, mortally wounding him.

The complaint and Davis' briefs to this Court emphasize the visible injuries he suffered during the "confrontation." Davis asserts that those injuries were exculpatory evidence that the officers ignored. But those injuries do not rule out probable cause. They might be used to paint Davis as a victim, but they also might be inculpatory evidence showing that Davis shot Timmy in anger and in retaliation for beating and injuring him.

More importantly, even where officers see or hear some exculpatory evidence, the fact that they still conclude probable cause exists does not mean they ignored or turned a blind eye or deaf ear to the exculpatory evidence. The probable cause determination depends on the totality of the evidence, inculpatory and exculpatory. *See Wesby*, 583 U.S. at 57 (reiterating that probable cause depends on the totality of the circumstances); *Howard*, 25 F.4th at 902 ("[I]nstead of focusing on a single piece of evidence in isolation and dismissing any evidence with an innocent explanation, we must look at the totality of the circumstances.") (quotation marks omitted); *Huebner*, 935 F.3d at 1187; *Paez*, 915 F.3d at 1286 (explaining that arresting officers making a probable cause determination "are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed") (quotation marks omitted).

Given the nature of human endeavors, in many situations where a crime has been committed there will be some contradictory evidence; it is not unusual for there to be evidence pointing in both directions. But it is plenty settled that before making an arrest a "law enforcement officer is not required to resolve every inconsistency found in the evidence." *Paez*, 915 F.3d at 1286. And in deciding whether probable cause exists, an officer is "not required to believe [exculpatory evidence] or to weigh the evidence in such a way as to conclude that probable cause did not exist." *Howard*, 25 F.4th at 902; *see also id.* ("[A] police officer need not resolve conflicting evidence in a manner favorable to the suspect."); *Jordan*, 487 F.3d at 1355 ("No officer has a duty to prove every element of a crime before making an arrest.").

Decisions finding a lack of probable cause because officers turned a blind eye to exculpatory evidence involve evidence offered or given to officers that did not merely make it less likely probable cause existed but obviously and irrefutably established that it didn't exist. Evidence that is speculative or ambiguous or dependent upon the self-serving statements of the suspect does not suffice to bring a case within that category. Instead, it must be concrete evidence that obviously and definitively rules out probable cause: multiple tattoos on the perpetrator's arm, which the suspect did not have, *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1292–94 (11th Cir. 2018); documents showing authorization to be in a house, which conclusively established innocence, *Carter v. Butts Cnty.*, 821 F.3d 1310, 1320–21 (11th Cir. 2016); or a description of a

marijuana-seller in her twenties while the person arrested was in her forties, coupled with the officer's own "serious doubts" that the person arrested was the perpetrator, *Tillman v. Coley*, 886 F.2d 317, 318–21 (11th Cir. 1989). *Accord Huebner*, 935 F.3d at 1190 n.5 (characterizing the tattoo evidence in *Cozzi* as "immediate and conclusive evidence that" the plaintiff was not the perpetrator).

There are no allegations that the arresting officers in this case were offered and refused to consider concrete evidence that would have obviously and definitively ruled out probable cause, either at the time of arrest or during the additional investigation that followed. There was no exculpatory evidence of *any kind* known or offered to them that clearly and indisputably exonerated Davis. Whatever Davis may speculate about the information the officers could have uncovered if they had done more investigating at the scene, the officers were not required to refute his self-serving explanation that he had acted in self-defense. *See Wesby*, 583 U.S. at 61; *Howard*, 25 F.4th at 902; *Huebner*, 935 F.3d at 1188; *Paez*, 915 F.3d at 1286; *see, e.g.*, *Loftin*, 33 F.4th at 781 ("A suspect's declaration of innocence is not a fact supporting a defense. And a soon-to-be arrestee's naked assertion of self-defense under these circumstances does not vitiate probable cause. Otherwise, every suspect for a litany of violent crimes could avoid, or delay, arrest by simply proclaiming self-defense.") (footnote omitted); *cf. Kumar*, 227 So. 3d at 559–60 (interpreting Florida's Stand Your Ground law and explaining that "if there is probable cause to believe that the person committed a felony, law enforcement is

authorized to immediately effectuate the arrest . . . and should clearly do so when there is probable cause to believe that a person has committed a serious crime of violence against another").

Davis relies heavily on our decision in *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004), but it is readily distinguishable. In that case, the plaintiff alleged that the officers "turned a blind eye to immediately available exculpatory information" in an effort to "exonerate" one of their fellow officers. *Id.* at 1229 n.10. And she was right.

We recently described in detail how "jarring" the *Kingsland* facts were. *See Huebner*, 935 F.3d at 1189. To understand just how different those facts are from the ones in this case, it's worth repeating our previous description of the *Kingsland* facts:

> The plaintiff there, Misty Kingsland, was involved in a car accident *with an off-duty police officer*, after which she climbed out of the wreck and sat down in a pile of shattered glass. Although a number of officers responded to the scene — ultimately as many as 20 — none of them approached Kingsland for a full 30 minutes, either to ask for her version of events or to inquire about her well-being. When they finally did, Kingsland told the officers that she had sustained injuries to her head and was dizzy and could not stand up. No one offered Kingsland any medical care — at the scene, or ever. Although one officer claimed to have detected an odor of cannabis emanating from Kingsland and her vehicle, nobody ever

searched her truck, summoned drug-sniffing dogs, or found any pot. When Kingsland (presumably still dizzy and sick) failed her field-sobriety tests, the officers put her in a cruiser and told her that she was being transported to the hospital for treatment and more tests; in fact, they took her into custody and drove her to a DUI testing facility. Once there, the officers administered multiple Breathalyzer tests, all of which came back negative — with a 0.000% alcohol content. Notably — and unsettlingly — in the face of the clean results, the officer completing paperwork asked a colleague what he should then write. Told to shift the focus back to marijuana — to write that Kingsland had a strong odor of cannabis emitting from her breath — the officer threw away the form he was writing on and started writing on a new form. After taking additional tests and providing a urine sample — which also later came back clean — Kingsland was handcuffed, transported to jail (still no medical care) and charged with DUI.

*Huebner*, 935 F.3d at 1189 (emphasis added) (citations and quotation marks omitted).

Unsurprisingly, in *Kingsland* we reversed the grant of summary judgment in favor of the officers, concluding that there were genuine issues of fact about whether their investigation was reasonable. 382 F.3d at 1225, 1230–34.

In *Huebner* we explained that the *Kingsland* case was one in which the arresting officers not only failed to follow up and ignored

exculpatory evidence but affirmatively misrepresented their intentions and may well have manufactured evidence to justify the arrest. 935 F.3d at 1190. And in *Washington* we explained that *Kingsland* did not "establish[] that every failure by an officer to discover 'easily discoverable facts' violates the Fourth Amendment." *Washington*, 939 F.3d at 1248. We stressed the jarring fact that a jury could have found in *Kingsland* that the officers fabricated evidence against the plaintiff. *Id.*; *see also Huebner*, 935 F.3d at 1189–90 (discussing *Kingsland* as a case with "jarring" facts).

The case before us is nothing like *Kingsland*. Davis' complaint doesn't allege any information that was "offered to" the officers that they refused to consider even though it would have negated probable cause.[4] The officers in this case did not manufacture evidence to create probable cause to arrest Davis.[5] They did not persist in exploring multiple bases for arrest until they finally found one they thought would work. Nor is there any implication

---

[4] In a sense, Davis did "offer" to the officers his own self-serving assertion that he had acted in self-defense, but as we have already discussed, binding precedent holds that in deciding whether to make an arrest, officers are not required to believe innocent explanations the suspect gives them. *See supra* at 15–16. A claim of self-defense does not establish innocence, and it does not negate probable cause. *See supra* at 15–16. Officers are not required to forego making an arrest until after they have investigated and ruled out any explanation a suspect offers them. *See supra* at 14–16.

[5] Davis alleges that an officer later made "false statements" in his application for a warrant to search Davis' house, but he doesn't allege that any of the officers made false statements or manufactured evidence when they arrested him.

here, as there had been in *Kingsland*, that the officers attempted at the expense of the plaintiff to shield a fellow officer from liability or arrest. 382 F.3d at 1223 (pointing out that the other party involved in the wreck was an off-duty officer and that 20 other officers ultimately showed up at the scene of the accident); *see also Huebner*, 935 F.3d at 1189 (describing the *Kingsland* facts).

Davis' allegations about bias focus on "personal animus and ill will" driven by "a deep-seated, bitter local youth football league and coaching rivalry" between Davis and the Chief of Police. That kind of subjective motivation makes no difference because "when reviewing an arrest, we ask whether the circumstances, viewed objectively, justify the challenged action, and if so, conclude that action was reasonable whatever the subjective intent motivating the relevant officials." *Nieves*, 139 S. Ct. at 1725 (alteration adopted) (emphasis and quotation marks omitted). "A particular officer's state of mind is simply irrelevant, and it provides no basis for invalidating an arrest." *Id.* (quotation marks omitted). Nothing Davis alleges about the investigation would have negated the probable cause determination that the officers made when they arrested him. And whatever the officers might have decided about self-defense involved credibility determinations. The evidence the officers found and learned about in this case was enough for a reasonable officer to believe, as these officers did believe, that there was a substantial chance Davis had committed a crime.

### E.  The Flaws in Davis' Inadequate Investigation Theory

Davis' claims are based not only on the theory that the officers ignored exculpatory evidence but also on the theory that they conducted an investigation that was so inadequate that it rendered the arrest unconstitutional.  Davis hyperbolically asserts that there was "*no* investigation."  He speculates that if the officers had asked what Davis views as the right questions, of what Davis views as the right people, at what Davis views as the right time, the officers would have concluded that he was justified in killing Timmy, and therefore there was no probable cause to arrest him.

But that theory guts the "practical, nontechnical" core of probable cause, *Brinegar*, 338 U.S. at 176; *see also Harris*, 568 U.S. at 244; *Pringle*, 540 U.S. at 370; *Gates*, 462 U.S. at 231, turning it into an impractical, expansive set of requirements for investigative procedures.  It is also inconsistent with the facts and with precedent.

### 1.  Davis' Theory is Inconsistent with the Facts

Davis' inadequate investigation theory is factually flawed.  He insists that "the City could have determined Stand Your Ground immunity without a judicial hearing by interviewing several witnesses on the scene."  And he complains that the officers conducted interviews only *after* he was arrested.  But, as Davis freely admits, those interviews *were* conducted.  Either that same night or in the early morning hours of the next day, the officers interviewed Davis' neighbors, his wife, their nine-year-old daughter (who was home at the time of the shooting), and Davis himself.

And, critically important, none of what any of those people said would have negated, or even seriously undermined, probable cause for the arrest.

### a. The Interviews of the Neighbors, Who Did Not Witness the Shooting

It is beyond dispute that the two neighbors Davis insists should have been interviewed did not see the shooting. And Davis admits that both of them actually did give sworn statements to the officers. In their statements the two neighbors swore that: "Mr. Davis and Timmy argued outside and then Mr. Davis walked inside his residence while Timmy walked down the street," and "[a]pproximately 30 minutes later, [the neighbors] heard two gun shots and saw Mr. Davis and Timmy walking out of their garage together."

Those allegations shed no light on the lawfulness of the deadly force Davis used against Timmy. None of what the neighbors allegedly said changes the probable cause calculus. The officers knew that Davis and Timmy had been arguing, knew that they had come outside the house, knew that shots had been fired, and when they arrived, they saw that Davis was lying on top of Timmy and had visible injuries to his face. (Timmy, of course, had far more serious injuries, ones that proved fatal.) None of that was at issue. Questioning the two neighbors immediately after the shooting, instead of hours later, would not have changed anything.

The self-defense question is whether, at the time he shot his son in the chest, a person in Davis' position would have reasonably

believed that using deadly force was "necessary to prevent immi-
nent death or great bodily harm to himself." Fla. Stat. § 776.012(2).
The issue is not whether a person in Davis' position could have
reasonably believed that deadly force was called for as retribution
or vengeance because of what his son had already done to him.
The doctrine of self-defense does not authorize lethal payback. *See
id.*

What matters to the self-defense question is what happened
just before Davis fired two shots at Timmy. And no one alleges
that either of the two neighbors saw what happened in the minutes
before they heard those two shots. Instead, the complaint alleges
that the two shots came about thirty minutes after the two neigh-
bors had seen Davis and Timmy arguing outside.

#### b.  The Interview of Davis' Nine-Year-Old Daughter, Who Did Not Witness the Shooting

The complaint does not allege Davis' nine-year-old daughter
saw the shooting either. At one point, it alleges that she was "pre-
sent during the incident," but it never specifies that "the incident"
included the actual shooting or the moments leading up to the
shooting itself, instead of the earlier arguing and fighting. And it
never specifies that she saw Timmy try to inflict serious injury or
death on Davis. Given Florida law's imminence requirement, *see*
Fla. Stat. § 776.012(2), what happened just before the shooting is
what matters to the self-defense question.

There is a general allegation in the complaint that the daugh-
ter's interview with detectives "only served to corroborate [her

father's] version of events," but that allegation is far too conclusory to count under *Iqbal* and *Twombly*. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (instructing that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Twombly*, 550 U.S. at 555, 570 (explaining that the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" because a plaintiff must move his claims "across the line from conceivable to plausible"); *see also Holland v. Carnival Corp.*, 50 F.4th 1088, 1096 (11th Cir. 2022) (holding that the plaintiff's "conclusory allegations" were "insufficient" to state a claim); *Doe v. Samford Univ.*, 29 F.4th 675, 687–88 (11th Cir. 2022) (holding that the plaintiff's allegations that certain "statements were 'prejudicial' and 'inflammatory' are 'not entitled to the assumption of truth' because these allegations are 'labels' and 'unsupported by factual allegations'") (alteration adopted) (quoting *Iqbal*, 556 U.S. at 678–79).

The complaint specifies that when the "attack occurred in the upstairs bathroom," Davis' daughter was "just outside the home." It also alleges that she saw Timmy in the garage (not upstairs) with his shirt off, which would have corroborated Davis' own statement that Timmy was shirtless in the garage. Davis asserts that Timmy had removed his sweatshirt and had thrown it on the ground, which Davis says that he interpreted as a "fighting gesture." But even if that is true, that fact would not have prevented a finding of probable cause to believe that Davis did not act in self-

defense when he killed Timmy.  Officers could reasonably believe that the act of taking off one's shirt does not amount to imminently inflicting death or great bodily harm, and therefore does not negate probable cause.  *See* Fla. Stat. § 776.012(2).

> c.  The Interview of Ms. Davis, Who Did Not Witness the Shooting

As for Ms. Davis, the complaint alleges that when she was interviewed by officers later, what she told them "only served to corroborate [her husband's] version of events."  That general and conclusory statement fails the *Iqbal* and *Twombly* test for the same reason that the identical allegation about what their daughter told the officers also fails that test.  *See supra* at 40–41.

A later paragraph in the complaint does add some specifics, but none that would have precluded probable cause.  It alleges that Ms. Davis corroborated her husband's position by describing why Timmy was upset and how upset he had been, how the fight with his father started, how she heard it going on upstairs, and how she heard Davis scream that his knees had been hurt.

Even if Ms. Davis had told all of that to the officers at the scene, they still would have had probable cause to arrest Davis for shooting his son.  What she allegedly told them would not have changed the central facts that the officers already knew, which were: the two men had fought; after they fought, Davis shot Timmy in the chest; Davis admitted to shooting Timmy; and Davis still had in his pocket the pistol that he had used to shoot Timmy.  Ms. Davis' later statement allegedly would have added that Timmy

pushed Davis first, and after the two men had fought, Davis had walked downstairs and shot Timmy. Her statement would in no way have prevented an officer from reasonably concluding that there was a substantial chance that shooting Timmy to death was not "necessary to prevent imminent death or great bodily harm to" Davis. *See Wesby*, 583 U.S. at 57; Fla. Stat. § 776.012(2).

The complaint also alleges that in her later interview Ms. Davis told the officers that after she went downstairs and saw Timmy on the ground after he had been shot, "he was apologizing to his father, telling Mr. Davis that he was sorry he had hurt Mr. Davis." But the remorse Timmy allegedly expressed after he had fought with his father, had hurt his father's knees, and had been shot by his father does not mean that no officer reasonably could have found probable cause to believe that Davis did not fire in self-defense. It does not mean that no officer could have reasonably found a substantial chance that Timmy was not inflicting or threatening to inflict serious injury or death on Davis when Davis shot him.

#### d. The Questioning of Davis Himself

Davis argues that the officers should have questioned him further at the scene. They did question him there. In response to their questioning, Davis admitted that he had shot Timmy, and he admitted he still had on him the pistol he had used to do it. He told the officers that he had shot his son "because my son beat me up and kept coming at me." In other words, he claimed he had shot Timmy in self-defense. If he had anything else he wanted to say to

the officers in his defense, all Davis had to do was say it. And, in any event, the officers were not required to believe anything he told them. *See supra* at 15–16.

> e. The Decision to Rush Timmy to the Hospital Instead of Interviewing Him

The final person Davis contends that the officers should have questioned is Timmy, who was dying when they arrived on the scene. Let's be brief about this one. It was entirely reasonable for the officers to focus their efforts at the scene on disarming Davis, getting him off the top of Timmy, and getting the gravely wounded Timmy to the hospital. Which they did. Besides, even though he felt remorse about the events of that evening, there is no reason to believe Timmy would have told the officers that his father shot him in self-defense, and they would not have been compelled to believe him if he had. *See supra* at 15–16.

> 2. Davis' Theory is Inconsistent with Our Circuit Precedent

Davis' inadequate investigation theory not only cannot be squared with the facts, it also cannot be reconciled with our precedent. It conflicts with our precedent that an officer is not required to be able to prove every element of a crime before making an arrest. *See supra* at 14. And it conflicts with our precedent that an officer is not required to have specific evidence of a suspect's subjective intent before making an arrest when the suspect's conduct gives rise to probable cause. *See supra* at 14–15. And it conflicts with our precedent that an officer is not required to resolve every inconsistency in the evidence before making an arrest. *See supra*

20-11994                Opinion of the Court                45

at 15–16.  And it conflicts with our precedent that before making an arrest an officer is not required to believe, or to rule out, a suspect's innocent explanation for suspicious facts.[6]  *See supra* at 15–16.

Davis' investigative inadequacy theory also gives inadequate consideration to the fact that domestic violence cases are particularly difficult and tense situations requiring officers to make on-the-scene decisions quickly, often in confusing and evolving

---

[6] Davis' theory of inadequate investigation also conflicts with the law of other circuits, which is consistent with our law.  *See Forest v. Pawtucket Police Dep't*, 377 F.3d 52, 57 (1st Cir. 2004) ("[T]he law is clear that once police officers are presented with probable cause to support an arrest, no further investigation is required at that point."); *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) ("It will, of course, always be possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer *might* have taken that *might* have shaken his belief in the existence of probable cause."); *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) ("It bears repeating that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful.  It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation.") (quotation marks omitted); *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 583 (7th Cir. 1989) ("[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence."); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (explaining that an officer doesn't have to believe a suspect's story even when it's plausible and doesn't have to "forego arrest pending further investigation if the facts as initially discovered provide probable cause").

circumstances. *See supra* at 18–19. They are the prototypical example of cases in which we should heed our own caution that "we cannot indulge the 20/20 vision of hindsight," and "it's not our role to armchair quarterback the officers' decision" at the scene. *Cooks,* 920 F.3d at 742 (quotation marks omitted).

If we had to choose one decision that shows how badly out of sync with our precedent Davis' investigative inadequacy theory is, it would be *Huebner*. That decision came in a case involving an arrest for battery that grew out of a "sister-squabble" complete with "hair-pulling, wrist-scratching, face-punching, and rock-throwing." 935 F.3d at 1185, 1189. Both sisters made 911 calls. *Id.* at 1185. A responding officer interviewed one of them and took her statement that the other sister had assaulted her. *Id.* Later, an officer arrested the other sister despite her protestations of innocence. *Id.* at 1186. He made the arrest without interviewing either of two witnesses the arrested sister claimed would corroborate her side of the story and exonerate her. *Id.*

The arrested sister sued. One of her claims was that the arresting officer had "failed to conduct a reasonable investigation because he relied solely on [the first] sister's unreliable and uncorroborated statements and ignored exculpatory evidence." *Id.* She argued that the officer had "arrested her without the necessary probable cause" both "because he didn't have reasonably trustworthy information indicating her guilt and because he failed to conduct an adequate investigation." *Id.* at 1187.

20-11994                Opinion of the Court                47

We held that the first sister's 911 call and the statement she had given the officers provided probable cause to arrest the plaintiff sister. *Id.* at 1188. We rejected the plaintiff sister's inadequate investigation argument, explaining that the officer "was not required to forego arresting" her "based on initially discovered facts showing probable cause simply because [she] offered a different explanation." *See id.* (quotation marks omitted). We emphasized that probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts so long as the totality of the circumstances presented a sufficient basis for believing that an offense had been committed. *Id.* And we concluded that "the totality of the evidence" available to the officers "provided ample basis for concluding that [the plaintiff sister] had committed a battery as defined by Florida law." *Id.* at 1188–89.

Our decision in *Huebner* illustrates the flaws in Davis' inadequate investigation theory and spotlights just how far afield that theory is from the facts of *Kingsland*, 382 F.3d at 1223–25, which he relies on. And from the facts of this case.

## II. RECAP AND SUMMARY

The Supreme Court has instructed us that a "probable cause decision, by its nature, is hard to undermine, and still harder to reverse." *Kaley*, 571 U.S. at 339. In this case Davis invites us to undermine the probable cause decision in more ways than one. He would have us raise the bar for probable cause above where the Supreme Court and this Court have set it. He would have us scrap the bedrock principle that officers making a probable cause

determination at the scene are not required to accept a suspect's innocent explanation, such as a claim of self-defense, or to forego making an arrest until they have investigated and ruled out that explanation. He would have us armchair-quarterback and second-guess the decision of three officers who responded to a 911 call about a domestic shooting and arrived to find a gravely wounded young man lying on the ground with the shooter, still in possession of the firearm, on top of him.

Davis asks us to assume the role of Investigator-in-Chief and criticize the investigation the officers made, finding it wanting based on his assertions that they should have done more or done it better. He assumes that if the officers had interviewed more people, or asked more questions of those they did interview, they might have found something to exonerate him. His invitation for us to post hoc superintend the investigation and accept his speculation about what might have been found runs directly contrary to binding precedent. And Davis never points to any probable-cause-precluding evidence that the officers would have uncovered if they had run the investigation the way he says they should have.

As we have discussed, *see supra* at 34–37, our *Kingsland* decision finding an investigation constitutionally inadequate involved extreme facts that do not resemble those in this case. More on point is our *Huebner* decision, a domestic violence case in which the officer arrested the plaintiff despite conflicting statements, the plaintiff's protests of innocence, and her insistence that two witnesses would exonerate her if only the officer would interview

them. *See* 935 F.3d at 1185–86. We rejected the *Huebner* plaintiff's inadequate investigation claim. *Id.* at 1188–89.

Davis has failed to state a claim under § 1983 that he was arrested without probable cause or that the officers' investigation was constitutionally inadequate. *See id.* For the same reasons, he has failed to state a claim for false arrest under Florida law. *See Rankin*, 133 F.3d at 1435 ("[T]he standard for determining whether probable cause exists is the same under Florida and federal law."); *see also Harder v. Edwards*, 174 So. 3d 524, 534 (Fla. 4th DCA 2015) (rejecting the plaintiff's argument that an officer's "investigation was too unreasonable to support probable cause, in that he conducted an inadequate investigation" before her arrest).

## III. THE DENIAL OF THE MOTION FOR A NEW TRIAL ON THE SEARCH CLAIM

Davis also asserted a 42 U.S.C. § 1983 claim that the City violated his rights under the Fourth Amendment because the officers conducted an unlawful search of his home. Davis alleged two theories of municipal liability arising from the search. One was based on the City's alleged "custom and practice" of allowing Chief Manley "in individual investigations, to override established protocols, standard operating procedures, and clearly established state law according to his whim," which caused a violation of Davis' Fourth Amendment rights. Davis' other theory of municipal liability was based on allegations about Chief Manley's conduct as a "final

policymaker" for the City.  Davis alleged that Chief Manley "personally and directly" led the officers to unlawfully search his house.[7]

The district court granted the City's motion to dismiss that claim, and Davis appealed.  In that earlier appeal, Davis contended that the district court hadn't addressed his allegation that Chief Manley was the final policymaker and that the Chief had directed the search of Davis' home, making the City liable for the alleged constitutional violation regardless of any "custom or practice" of constitutional violations.  *Davis*, 734 F. App'x at 618–19.  This Court agreed with that contention.  *Id.* at 619.  We concluded that instead of addressing Davis' "final policymaker" allegation based on Chief Manley's role in directing the search, the district court had

---

[7] It's well-established that a municipality cannot be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior. *See Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Instead, municipal liability must be based on a governmental policy or custom.  *Id.*; *see also Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 819 (11th Cir. 2017) (explaining that a municipality or county "rarely will have an officially-adopted policy of permitting a particular constitutional violation" and so plaintiffs often "must show that the [municipality] has a custom or practice" of permitting it and that the "custom or practice is the moving force behind the constitutional violation"). We refer to that as custom or practice liability.

Under certain circumstances, municipal liability may also be based on a single decision by a municipal official with final policymaking authority.  *See Scala*, 116 F.3d at 1399 (discussing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)); *see also Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).  We refer to that as final policymaker liability.

"addressed and rejected Davis's alternative allegation that the City had a custom of improper training or permitting the Chief of Police to override established protocols and standard operating procedures." *Id.* at 620. We determined that Davis had "stated a claim for relief against the City based on a single decision by a final policymaker." *Id.* We left in place the district court's determination about Davis' failure to state a claim based on a custom or practice theory of municipal liability. *See id.* And we remanded for further proceedings consistent with our opinion. *Id.* at 623.

Back in the district court, Davis' unconstitutional search claim went to trial. Davis presented some evidence that the City had a custom or practice of allowing unconstitutional searches, but that evidence was still tied to Chief Manley as the final policymaker. Davis called as a witness David Call, who had served as a lieutenant with the Apopka Police Department while Robert Manley was Chief of Police. (At the time of the trial, Call was retired.) Call testified that Chief Manley ran the police department and was the "policymaker." He testified that Chief Manley was on the scene and "in charge" on the day Davis' house was searched. And Call described Manley as "a hands-on-type chief" who "wanted to know what was going on" at the scene of crimes and investigations; he was "in charge."

Davis' counsel asked Call if the police department had "a policy or procedure" of conducting unlawful searches before a warrant was issued, and Call answered, "No." But he went on to testify that officers unlawfully searched Davis' home before obtaining a

warrant and that doing so is "the culture of the Apopka Police Department." When asked what he meant by "culture," he explained:

> It was common practice that a search warrant — if we obtained a search warrant or knowing we were going to get one, the house was entered and — not necessarily searched each and every time on each and every case, but it was a common practice to go ahead and go into those dwellings or homes or vehicles knowing that a search warrant was coming.

He testified that Chief Manley was "aware of that" practice, and when asked whether Chief Manley would have known about the unlawful search of Davis' home if he had been on the scene, Call answered, "Yes."

On cross-examination, Call testified, "I can't say whether [Chief Manley] did or didn't participate in the search" of Davis' home. He was impeached with his earlier deposition testimony as part of Davis' criminal case where he swore that Chief Manley didn't participate in the search of Davis' home. On redirect, Call testified that his earlier deposition testimony about the chief's lack of participation in the search was about whether the chief had gone into Davis' home and actually "collected evidence."

Based on Call's testimony, Davis sought a jury instruction on both a final policymaker theory of municipal liability and a more general custom or practice theory. Specifically, he asked for this instruction:

Defendant City is not liable for violating Plaintiff Davis' constitutional rights simply because it employed the law enforcement officers or officials, including Chief Manley. Rather, Defendant City is liable if Plaintiff Davis proves that Chief Manley, who was the final policy maker for Defendant City, ordered, directed, participated in, approved, or ratified the unlawful search or that an official policy or custom of Defendant City caused the unlawful search.

An "official policy or custom" means:

(a) A policy statement or decision made by Defendant City's final policy-maker, Chief Manley; or

(b) A practice or course of conduct that is so widespread that it has acquired the force of law—even if the practice has not been formally approved.

You may find that an "official policy or custom" existed if there was a practice that was so persistent, widespread, or repetitious that the Defendant City's final policy-maker, Chief Manley, either knew of it or should have known of it.

The district court refused to give that instruction and instead gave another one that limited the basis for municipal liability to a final policymaker theory:

[T]he City of Apopka is not liable for violating Mr. Davis' constitutional rights simply because it employed law enforcement officers or officials, including Chief Robert Manley, III.

> Rather, the City of Apopka can only be liable if Mr. Davis proves that Chief Manley, who was the final policymaker for the City of Apopka, directed, participated in, adopted, or ratified the unlawful search.

The jury returned a verdict in favor of the City, and after the court entered judgment on the verdict Davis sought a new trial. He contended, among other things, that the court abused its discretion by declining to give his requested instructed on a custom or practice theory of municipal liability.

The district court refused to grant a new trial. Referring to this Court's mandate from Davis' first appeal, the district court determined that we had reversed the part of its judgment based on Davis' final policymaker theory of municipal liability for the allegedly unconstitutional search, while leaving in place the part of that judgment based on a custom and policy theory of municipal liability. The district court also noted that Davis' summary judgment briefing lacked any "claims or evidence" about a custom or practice theory of liability. Custom or practice as a basis for the City's liability was "an issue not properly before the jury." As a result, it would have been inappropriate to include a jury instruction on custom or practice.

Davis challenges that ruling, contending that the district court abused its discretion by declining to give his requested jury instruction on a custom or practice theory of municipal liability. The City contends that custom or practice liability was not

properly before the jury, and there was no reason to give Davis' requested instruction about it.

"[W]e review for abuse of discretion both a refusal to give a requested jury instruction and a denial of a motion for a new trial." *United States v. Approximately $299,873.70 Seized from a Bank of Am. Acct.*, 15 F.4th 1332, 1336 (11th Cir. 2021) (citation omitted). A district court abuses its discretion by refusing to give a requested jury instruction "only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013) (quotation marks omitted).

The district court did not abuse its discretion in refusing to give Davis' requested instruction because the issue of custom or practice liability was not, as the court pointed out, properly before the jury. *See id.* In Davis' earlier appeal, this Court recognized that the district court had rejected Davis' allegations about a custom or practice of constitutional violations. *See Davis*, 734 F. App'x at 620. We held that Davis had "stated a claim for relief against the City based on a single decision by a final policymaker," but we left in place the district court's ruling about custom or practice liability. *See id.* And we remanded for further proceedings consistent with our opinion. *Id.* at 623. The district court, as it was required to do, followed this Court's mandate when it determined that the issue of custom or practice municipal liability was not properly before the

jury. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 843 (11th Cir. 2018) ("The law of the case doctrine and the mandate rule ban courts from revisiting matters decided expressly or by necessary implication in an earlier appeal of the same case.") (quotation marks omitted).

Not only that, but Davis points to no evidence other than Call's testimony showing that a custom or practice theory of liability was part of the case. Davis' theory of municipal liability was tied to Chief Manley throughout the case, and the jury instruction the district court gave properly reflected that. The instruction referred to Chief Manley "ratif[ying]" an unlawful search, which was consistent with the testimony that Call gave. The jury specifically found that Davis had not met his burden of proving that Chief Manley "knowingly directed, participated in, adopted, or ratified the unlawful search" of Davis' home.

In light of this Court's mandate and the evidence presented (and not presented) during the course of the proceedings, the district court did not abuse its discretion in refusing to give Davis' requested instruction and in denying his motion for a new trial.

## IV. CONCLUSION

The district court's judgment is affirmed.

**AFFIRMED.**