[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14425

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

AARON LEWIS GREEN, JR.,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:18-cr-00049-HL-TQL-1

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

PER CURIAM:

Aaron Green, Jr., appeals his conviction under 18 U.S.C. § 922(g)(1) for possessing a firearm as a convicted felon and the 120-month sentence of imprisonment the district court imposed. He argues that his conviction should be set aside because the district court erroneously denied his motion to suppress evidence of the firearm that served as the basis for his felon-in-possession conviction. He contends that police obtained the firearm in a search that violated the Fourth Amendment. He also argues that the district court erred when it granted the government's motion in limine, which prevented him from presenting a justification defense at trial. As to his sentence, he argues the district court erred when it applied three enhancements under the Sentencing Guidelines that increased his offense level.

After careful review, and with the benefit of oral argument, we affirm Green's conviction. But we conclude that the district court erred in applying two of the sentencing enhancements. We therefore vacate his sentence and remand to the district court for resentencing.

## I.    BACKGROUND

In this section, we begin with the facts pertinent to Green's shooting of David Olson, an act he claims was justified because he acted in self-defense. The shooting led to his arrest, which we describe next. Then we review the facts relevant to his challenges to

21-14425                Opinion of the Court                3

his conviction. These challenges arise from two pretrial motions: his motion to suppress the evidence of the firearm on which his § 922(g)(1) conviction was based and the government's motion in limine to prevent him from offering a justification defense at trial. Finally, we turn to the facts relevant to Green's challenges to his sentence.

### A.    The Shooting that Led to Green's Arrest

According to the government, Green and his wife met Olson and Olson's girlfriend, Robin Grobey, at a restaurant, where they shared conversation about both couples' dogs. Two days later, the couples met again at the restaurant, and Grobey and Olson accepted an invitation to follow Green back to his residence. After they arrived, Green became upset when Olson refused to allow his dog to fight Green's dog. In the altercation that followed, Green shot Olson four times. Immediately after shooting Olson, Green helped Grobey load Olson into their vehicle. He threatened her "by telling her not [to] tell anyone and to get Olson off his property before he did something bad to her as well." Doc. 263 at 4.[1]

In Green's version of the shooting, he shot Olson after Olson touched him on his neck. Fearing that Olson and Grobey were conspiring to kill him, he left the scene of the shooting with the firearm, but he became incapacitated because he had been drugged earlier in the evening.

### B.    The Arrest

---

[1] "Doc." numbers refer to the district court's docket entries.

Lowndes County Sheriff's Office ("LCSO") Deputy David O'Steen was on patrol when he learned of 911 calls reporting shots fired at Green's address. Because O'Steen had responded to Green's address three or four times before, he knew that Green lived there. O'Steen testified that he knew Green and Green's criminal history from these visits and from having previously picked Green up on a probation warrant. When O'Steen and other deputies arrived at Green's home, they found bullet shell casings on the lawn. But Green was not there. While O'Steen was at Green's residence, dispatch told him about a 911 call reporting a Black male sleeping on the lawn of a church about a mile away. O'Steen believed that the unidentified male could be Green. Dispatch also notified O'Steen that a shooting victim had arrived at a nearby hospital for treatment. O'Steen knew of no other shots-fired calls originating from other addresses during this time.

When he arrived at the church with other deputies, O'Steen recognized the man on the lawn as Green. O'Steen and the other deputies suspected that Green could be the shooter and still armed. When another deputy pointed out a shiny object lying near or underneath Green's shirt, O'Steen thought that the object could be a firearm.

While standing 10 to 15 feet away, the deputies shouted at Green for approximately two minutes, commanding him to show his hands. They warned they would use their tasers on him if he did not comply. Green was awake and could understand the deputies, but he did not respond to their commands. When he did not

comply, the deputies, thinking that he might have a weapon and fearing for their safety, fired their tasers at him. After being tased, he followed the deputies' commands, and they ceased tasing him.

After handcuffing Green, the deputies searched him and discovered a knife and a firearm in his waistband. When they seized his firearm, he said, "Ain't no gun, ain't no gun, ain't no gun in my belt. Where did that come from?" Doc. 212 at 8.

Green was arrested on state charges of aggravated assault and being a felon in possession of a firearm.

## C.    The Pre-Trial Motions and Trial

A federal grand jury later charged Green with being a felon in possession of a firearm. He pleaded not guilty. Green was initially represented by counsel. But he asked to represent himself at trial. After a *Faretta*[2] hearing, the district court granted Green's request.

Before trial, Green and the government each filed motions to prevent the other from presenting certain evidence at trial. We begin with Green's motion to suppress and then turn to the government's motion to prevent Green from presenting a justification defense at trial.

Green filed a motion to suppress all evidence, including the firearm on which his conviction was based, that the government obtained from the deputies' search of his person at the time of his

---

[2] *Faretta v. California*, 422 U.S. 806 (1975).

arrest. He contended that the search violated his Fourth Amendment rights. The district court held a hearing addressing the motion to suppress.

At the suppression hearing, the government called O'Steen, who testified about the events leading up to Green's arrest. During the hearing, Green stated that a church pastor had called 911 and reported that he had been unable to wake the man who was asleep on the church lawn. He also called to the stand another law enforcement officer present at the scene, LCSO Deputy James Holcomb. Following the suppression hearing, the district court issued a written order in which it made factual findings consistent with our description in Section I.B above of the facts pertinent to Green's arrest.

Based on these findings of fact, the district court denied the motion to suppress. The court concluded that the deputies had probable cause to arrest Green because the information available to the officers at the time "presented a fair probability" that he had fired the shots at his address and retained possession of the firearm. Doc. 212 at 11. In the district court's view, "a prudent officer could reasonably believe that Green had committed a violent offense with a deadly weapon: *i.e.*, aggravated assault." *Id.* And upon arresting him, the court explained, the deputies were permitted to conduct a search incident to arrest, during which they found the firearm. The district court concluded that there was no constitutional violation; thus, the search was lawful, and the evidence would not be excluded.

The government filed a motion in limine to prevent Green from raising a justification defense at trial. Before trial, Green notified the court that he planned to "raise the defense of justification or self-defense." Doc. 51 at 1. The government argued that Green could not show the first element of the justification defense—that he "was under unlawful and present, imminent, and impending threat of death or serious injury"—because of the amount of time that elapsed between the shooting and when the deputies found him in possession of a firearm on the church lawn. Doc. 292 at 5.

At the pretrial conference, the district court heard from the parties on the government's motion in limine. Green argued that he was acting in self-defense because he shot Olson after Olson "touched [him] on the back of [the] neck." *Id.* at 10. In response to the court's questioning, Green said, "I shot [Olson], yes, in self-defense." *Id.* After conceding that the deputies encountered him on the church lawn two to two-and-a-half hours after the shooting, Green explained that he had not rid himself of the firearm because he faced an "ongoing conspiracy against [his] life" from Olson and Grobey and because he had been drugged at some point earlier in the evening. *Id.* at 9–10.

The district court granted the government's motion in limine. The court agreed with the government that Green could not rely on the defense because he still had the firearm "two or two-and-a-half-hours" after his encounter with Olson. *Id.* at 12.

The case went to trial. At trial, the jury heard from O'Steen and other deputies about how they found Green in possession of a

firearm on the church lawn. The government also introduced evidence that, at the time, Green was a convicted felon and knew of his felony conviction. At the conclusion of the trial, a jury convicted Green of one count of violating § 922(g)(1).

### D.    The Sentencing

Following trial, a federal probation officer prepared a presentencing investigation report ("PSR"). The PSR calculated Green's base offense level as 20, with a total offense level of 28. His total offense level of 28 and criminal history category of VI yielded a guidelines range of 140 to 175 months' imprisonment. But the statutory maximum limited the possible punishment to 120 months.[3] The PSR recommended a two-level enhancement for possession of a stolen firearm under § 2K2.1(b)(4) of the Sentencing Guidelines, a four-level enhancement for use of a firearm in connection with another felony offense under § 2K2.1(b)(6)(B), and a two-level enhancement for obstructive conduct under § 3C1.1.

In support of the § 2K2.1(b)(4) enhancement for possession of a stolen firearm, the PSR explained that "[a] firearms trace was also conducted and officers discovered the weapon was reported stolen June 6, 2018 from a vehicle." Doc. 263 at 4. The PSR

---

[3] The government notes in its brief that Congress increased the statutory maximum for § 922(g)(1) offenses committed after June 25, 2022 to 180 months. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159 § 12004(b), 136 Stat. 1313, 1329 (2022). Because Green's offense conduct occurred before this date, 120 months is the applicable statutory maximum.

described a statement by the firearm's owner reporting that it was stolen between June 1, 2017, and August 1, 2017.

As to the § 2K2.1(b)(6)(B) enhancement for use of a firearm in connection with another felony offense, the PSR explained that Green used the firearm "in connection with the commission of another offense, to wit: Aggravated Assault on April 29, 2018, in Lowndes County, Georgia." *Id.* at 6. The PSR noted that the state aggravated assault charge remained pending at the time of Green's sentencing.

Regarding the two-level § 3C1.1 enhancement for obstruction of justice, the PSR recommended its imposition because Green "willfully obstructed or impeded, or attempted to instruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and any relevant conduct." *Id.* at 5. Specifically, the PSR explained that Green threatened the victim's girlfriend, Grobey, "by telling her not to tell anyone and to get Olson off his property before he did something bad to her as well." *Id.* at 4.

Green objected to the recommended enhancements. Addressing the § 2K2.1(b)(4) enhancement, he noted that the date the firearm was reported stolen, June 6, 2018, was after the date of his arrest, April 29, 2018. He attached a copy of a police report to his objection. The police report included a victim statement, dated June 6, 2018, reporting that the victim's firearm had been stolen between June 1, 2017, and August 1, 2017. The statement included

a receipt for the firearm that matched the type and serial number of the firearm in Green's possession.

Turning next to the § 2K2.1(b)(6)(B) enhancement, Green argued that "it would amount to clear error to increase [the offense level] by 4 points upon allegations not proven beyond a reasonable doubt and without the defendant being convicted of a related crime." Doc. 260 at 5. And he noted that he had "not been convicted of another crime that involves the same or any firearm." *Id.*

Lastly, as to the § 3C1.1 enhancement, Green argued that it was improper because the PSR relied on "allegations of a questionable witness, the account has not been proven to be true beyond a reasonable doubt." *Id.* at 3. And Green explained that none of the witness's assertions were "presented to the jury for a determination of [their] veracity." *Id.*

At the sentencing hearing, Green again objected to the PSR's recommendation that the district court impose the three enhancements. Beginning with the § 2K2.1(b)(6)(B) enhancement, he contested the PSR's reliance on "unproven facts and unproven allegations" in concluding the § 2K2.1(b)(6)(B) enhancement was appropriate. Doc. 293 at 23. In response, the government explained that "the defendant was charged with aggravated assault, amongst other charges, by Lowndes County Superior Court" and that these charges were "directly related to the offense conduct of the offense of conviction in this case." *Id.* at 25. The district court overruled Green's objection to the § 2K2.1(b)(6)(B) enhancement.

Addressing the § 2K2.1(b)(4) enhancement, Green reiterated his written objection to the PSR that the firearm "had not been reported to be stolen and therefore can't be considered a stolen firearm on April 29, 2018." *Id.* at 16. The government responded that the police report Green himself filed showed that the firearm had been stolen before coming into his possession and that he was mistaken to argue that the "stolen" status of the firearm depended on when the police report was filed. The district court overruled Green's objection to the § 2K2.1(b)(4) enhancement.

Finally, as to the § 3C1.1 enhancement, the government informed the district court that body-camera footage showed that Grobey reported to the police that Green "threaten[ed] her that if she told anybody what happened—i.e., that aggravated assault against her boyfriend—that he would indeed do something to her." *Id.* at 15. The district court then overruled Green's objection to the enhancement.

At the conclusion of the sentencing hearing, the district court sentenced Green to the statutory maximum of 120 months in prison. In its statement of reasons, the court adopted the PSR without change.

This is Green's appeal. He is represented by appointed counsel on appeal.

## II.    DISCUSSION

We first address Green's arguments that his conviction should be vacated because the district court erred by denying his motion to suppress the evidence of the firearm deputies discovered

during their search of his person and by granting the government's motion precluding him from offering a justification defense at trial. As we explain below, we reject Green's challenges to his conviction.

We then address the district court's application of three Sentencing Guidelines enhancements. We agree with Green that he must be resentenced because the district court erred in applying two of the enhancements.

### A.    Green's Challenges to His Conviction

In this section, we address Green's arguments that his conviction should be vacated because the district court erroneously (1) denied his motion to suppress the evidence of the firearm and (2) prevented his presentation of a justification defense at trial.

#### 1.    *The district court did not err in denying Green's motion to suppress.*

We begin with Green's argument that the district court erred in denying his motion to suppress evidence discovered in the deputies' search of his person that yielded the firearm that was the basis of his § 922(g)(1) conviction.

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error and its application of the law to the facts *de novo*." *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1301 (11th Cir. 2021) (internal quotation marks omitted). "We construe the facts in the light most favorable to the party that prevailed below[.]" *Id.*

Green argues on appeal that the district court should have granted the motion to suppress because the deputies committed two Fourth Amendment violations. First, he argues that they lacked reasonable suspicion to detain him when they arrived at the church. Second, he argues that the deputies lacked probable cause when they arrested him.

Because the deputies' initial detention of Green preceded the arrest and search, we begin our analysis there. We evaluate the legality of searches and seizures by law enforcement under varying levels of scrutiny depending on the nature of the law enforcement action in question. *See United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) ("We have categorized encounters between police and citizens into three types, with varying levels of Fourth Amendment scrutiny: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." (internal quotation marks omitted)). The parties contend that Green's initial detention falls within the second tier of police encounter, also known as a *Terry* stop. We agree and proceed under that standard.

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). An investigatory detention of a suspect is appropriate where "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop

'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Jordan*, 635 F.3d at 1186 (quoting *Terry*, 392 U.S. at 19–20, 30). Green does not argue that the deputies' conduct was unreasonable in scope, so we address only *Terry*'s first prong, whether the deputies had reasonable suspicion to detain him. As part of this analysis, we consider in totality all the facts known to the deputies at the time of Green's detention. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that courts look to the "totality of the circumstances of each case" to determine if the officer has a "particularized and objective basis for suspecting legal wrongdoing" based on "the cumulative information available" (internal quotation marks omitted)).

We conclude that the deputies' initial detention of Green was lawful because when the deputies stopped him and then tased him, they had reasonable suspicion to believe that he had committed a crime by shooting someone at his home a few hours earlier. We reach this conclusion because the totality of the circumstances known to the deputies—their observation of the possible firearm in Green's possession and the facts indicating his involvement in a shooting immediately before the deputies encountered him—show that the deputies held a "particularized and objective basis for suspecting" his involvement in the earlier shooting and that the firearm used in that shooting was still in his possession. *Id.* (internal quotation marks omitted).

That the officers had reasonable suspicion to detain Green is bolstered by his defensive behavior once the deputies encountered

him on the church lawn. Green did not show his hands despite the deputies' shouted verbal orders to do so for approximately two minutes. Green contends that he did not immediately comply because he was drugged and could not comprehend what deputies were telling him to do. But we view the facts in the light most favorable to the prevailing party, the government, and based on the facts adduced at the hearing on the motion to suppress, the district court found that Green was coherent and intentionally failed to follow the deputies' commands. *See Gonzalez-Zea*, 995 F.3d at 1301. We therefore agree with the district court that Green's failure to comply supports the conclusion that the deputies had reasonable suspicion to detain him.

Further, the facts of this case fall squarely within the bounds of our *Terry* stop precedent. In *Jordan*, we concluded that reasonable suspicion existed, in part, because an officer "noticed a gun-shaped bulge in the defendant's pocket." 635 F.3d at 1187. Likewise, we considered the defendant's evasive and noncompliant behavior when approached by police officers because "[d]efensive behavior toward police is a relevant factor in [the reasonable suspicion] inquiry." *Id.* And in a similar case, we concluded reasonable suspicion existed where a suspect had "a visible, suspicious bulge" in his waistband and "walked quickly away" when officers approached. *United States v. Hunter*, 291 F.3d 1302, 1306–07 (11th Cir. 2002).

Here, like the gun-shaped object obscured by clothing in *Jordan*, the deputies observed a shiny object underneath or beside Green and believed it could be a gun. And the deputies suspected

that Green had committed a shooting shortly before this encounter based on a reported shooting at Green's residence, the discovery of shell casings there, and a report that a shooting victim had arrived at a nearby hospital. Thus, the deputies' suspicion about Green's wrongdoing based on the possible firearm and his defensive behavior comports with our precedent concluding that reasonable suspicion existed.

Green nevertheless argues that the deputies lacked reasonable suspicion to detain him because they "knew only that shots had been fired near [Green's] home and a shooting victim was admitted to a 'nearby' hospital *an hour later*." Reply Br. 6 (emphasis in original). And so, he says, the deputies "did not know whether . . . Green had been near his home to fire the shots . . . and . . . there was not sufficient information tying the gunshot victim to . . . Green's home." *Id.*

We disagree. Given the totality of the circumstances that we have described, the deputies did not need confirmation that Green was involved in the shooting to form reasonable suspicion. Considering these circumstances, we are unpersuaded that the passage of an hour between the shooting and the shooting victim's reported arrival at a hospital negates the reasonableness of the deputies' suspicion that Green was involved in the shooting.

Next, we turn to whether probable cause supported Green's arrest. An arrest is supported by probable cause if "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient

21-14425                Opinion of the Court                17

to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Probable cause exists if the totality of the circumstances known to the officers could persuade a reasonable officer that there is a 'substantial chance of criminal activity' by the person who is arrested." *Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). It "does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). "Because probable cause requires less than a preponderance of the evidence, it necessarily follows that probable cause does not require that it be more likely than not the person arrested for a crime is actually guilty of it." *Davis*, 78 F.4th at 1334.

Green's challenge to his arrest and subsequent search incident to arrest fails for the same reasons as his *Terry* stop challenge. We agree with the district court that the facts elicited in the suppression hearing supported the deputies' probable cause to arrest Green for violent assault with a deadly weapon. The totality of the circumstances could "persuade a reasonable officer that there [was] a 'substantial chance of criminal activity'" by Green. *Davis*, 78 F.4th at 1334 (quoting *Wesby*, 583 U.S. at 57).[4]

---

[4] The government says that the deputies' search that yielded the firearm preceded, instead of followed, his arrest. In the government's view, O'Steen's

Green counters that the deputies' cumulative knowledge at the time of his arrest was insufficient to establish probable cause. He contends that the deputies lacked sufficient information that he was the shooter and that the report of the shooting victim's admission to a hospital did not establish that he was shot at Green's residence.

These arguments are unpersuasive. Again, the deputies did not need to have "anything close to conclusive proof" that Green committed the shooting at the time to arrest him. *Paez*, 915 F.3d at 1286. Because the totality of the circumstances showed that there was a "substantial chance" that Green had taken part in criminal activity, the officers had probable cause to arrest him. *Davis*, 78 F.4th at 1334 (quoting *Wesby*, 583 U.S. at 57). Therefore, the district court correctly concluded that his arrest was supported by probable cause and that the deputies' search incident to arrest that yielded the firearm was lawful.

> 2. *The district court did not err in precluding Green from offering a justification defense at trial.*

---

discovery of Green's firearm created a "reasonable belief, based on his knowledge of Green's prior criminal history, that by possessing a gun Green was committing a crime." Appellee's Br. 34. The government thus urges us to consider the firearm's discovery and O'Steen's knowledge of Green's criminal history as supporting a conclusion that there was probable cause to arrest Green for possessing a firearm as a felon. Given our conclusion that the officers had probable cause to arrest Green for aggravated assault, we need not address whether they also had probable cause to arrest him for possessing a firearm as a convicted felon.

We next address Green's argument that the district court erred when it granted the government's motion in limine to prevent him from presenting a justification defense to the jury. As we explain below, the district court did not err in granting the motion.[5]

We have long recognized that a justification or necessity affirmative defense is available to a defendant charged with possessing a firearm as a convicted felon in violation of § 922(g)(1). *See United States v. Deleveaux*, 205 F.3d 1292, 1297 (11th Cir. 2000). But it is available in "extraordinary circumstances" only. *Id.*

To have an affirmative defense submitted to the jury, a defendant must "produce or proffer evidence sufficient to prove the essential elements of the defense." *United States v. Amede*, 977 F.3d 1086, 1102 (11th Cir. 2020) (internal quotation marks omitted). For a necessity or justification defense to a § 922(g)(1) charge, a defendant must show four elements:

> (1) that the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal

---

[5] The parties disagree about the standard we should use to review the district court's grant of the government's motion in limine. The government urges us to review the district court's decision for abuse of discretion and Green responds that a *de novo* standard of review applies. We need not address which standard of review applies because, as we explain below, the district court did not err in precluding Green from presenting a justification defense even if we were to apply the less deferential *de novo* standard of review.

conduct; (3) that the defendant had no reasonable le-
gal alternative to violating the law; and (4) that there
was a direct causal relationship between the criminal
action and the avoidance of the threatened harm.

*United States v. Vereen*, 920 F.3d 1300, 1310–11 (11th Cir. 2019) (inter-
nal quotation marks omitted).

The parties disagree about whether Green proffered suffi-
cient facts to satisfy the first prong—whether he "was under unlaw-
ful and present, imminent, and impending threat of death or seri-
ous bodily injury." *Id.* (internal quotation marks omitted). This
prong "requires nothing less than an immediate emergency."
*United States v. Rice*, 214 F.3d 1295, 1297 (11th Cir. 2000).

We agree with the district court that the hours-long delay
between the shooting and Green's encounter with the deputies
foreclosed his use of the justification defense. There is no evidence
in the record to support that he faced a "present, imminent, and
impending threat of death or serious bodily injury" when deputies
found him on the church lawn with a firearm at least two hours
after the shooting. *Vereen*, 920 F.3d at 1310–11 (internal quotation
marks omitted).

Still, Green urges us to consider his testimony at the pretrial
conference that "Olson touched [him] on the back of his neck,
which made [him] believe that he was being attacked, and fear for
his life." This, in his view, shows that he shot Olson in self-defense.
And he points to his statement at the pretrial conference that Olson
survived the shooting and Olson's girlfriend was at the scene.

Green argues that these facts, when combined, constituted continuing imminent danger and justified his possession of the firearm as he left the scene of the shooting. Lastly, citing *Vereen*, he contends that there was no reasonable opportunity for him to dispose of the firearm after leaving the scene of the shooting because he was incapacitated from being drugged earlier in the evening.

Green's initial assertion—that Olson allegedly initiated physical contact with him preceding the shooting and he responded by shooting Olson in self-defense—does not carry the day. It fails to justify his remaining in possession of the firearm for at least two hours *after* the shooting. Nor can it establish that Green faced an "immediate emergency" when the deputies found him on the church lawn with the firearm hours later. *Rice*, 214 F.3d at 1297.

Our precedent confirms this conclusion. In *United States v. Bell*, 214 F.3d 1299 (11th Cir. 2000), we considered the scope of the first element of the justification defense. In that case, the district court refused to allow Bell to introduce evidence supporting a justification defense. *Id.* at 1300. In support of his effort to use the defense at trial, Bell proffered that assailants fired upon him and others, but he managed to wrestle away a firearm while an assailant was reloading. *Id.* at 1301. He kept the firearm because he feared that the assailants would return in the future. *Id.* The assailants did, in fact, return and resumed attacking him. *Id.* After this second attack, Bell retained possession of the firearm because he feared another attack from the assailants. *Id.* Four days after he initially came

into possession of the firearm, police executed a search warrant on his property and seized the firearm. *Id.*

We affirmed the district court's decision precluding Bell from presenting a justification defense at trial. *Id.* We reasoned that he could not satisfy the first element of the justification defense because he maintained possession of the firearm after the immediate threat ended—three days had elapsed since the last actual threat. *Id.* We also relied on *United States v. Parker*, 566 F.2d 1304, 1306–07 (5th Cir. 1978),[6] in which our predecessor Court held that the justification defense was not available to a defendant who possessed a firearm for 30 minutes following an attack in his home. *Bell*, 214 F.3d at 1301. Further, we noted that "there was no evidence that the assailants had a compelling motive to attack Bell again, that they could have located him had he simply moved, or that the authorities were unwilling to protect Bell." *Id.* at 1302.

Under our precedent in *Bell* and *Parker*, Green's failure to promptly dispossess himself of the firearm following the shooting supported the district court's decision to prevent him from offering the justification defense. Importantly, he introduced no evidence that Olson had a compelling motive to attack him again, that Olson could have located him once he left his home, or that authorities would not have protected him.

---

[6] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Green's additional contentions—that Olson and his girlfriend presented a continuing threat to his life after the shooting and that he was drugged and incapable of disposing of the firearm—are more relevant, but both are unsupported by the record. Without more, Green's assertion that he faced an "ongoing conspiracy against [his] life" after the shooting does not establish that he faced an ongoing emergency or present, imminent, and impending threat from Olson or his girlfriend two hours after the shooting. Doc. 292 at 9. In support of the incapacitation argument, Green points to his statement at the suppression hearing indicating that the church pastor said on a 911 call that he was unable to wake Green on the church lawn to the government's concession that Olson appeared to be "very intoxicated" at the hospital. Appellant's Br. 30 (internal quotation marks omitted). But this evidence, too, is insufficient to merit a justification defense. Even if the continued possession of a firearm could be justified due to intoxication, which we do not decide here, the record does not support that Green's purported intoxication prevented him from promptly dispossessing himself of the firearm after the shooting. Instead, the record evidence indicating Green's possible intoxication—observations of Green at the church and hospital—occurred no sooner than two hours after the shooting. Therefore, there is no evidence that the possible drugging's effects set in before the "immediate emergency" was over. *Rice*, 214 F.3d at 1297.

Thus, we conclude that the district court correctly prevented Green from offering a justification defense at trial because he failed to offer evidence to prove that he was under a "present, imminent,

and impending threat of death or serious bodily injury" when the deputies encountered him with a firearm. *Vereen*, 920 F.3d at 1310–11 (internal quotation marks omitted).

## B.    Green's Challenges to His Sentence

Having disposed of Green's challenges to his conviction, we turn to his challenges to the district court's application of three enhancements to his total offense level at sentencing.

As to Green's sentencing challenges, we review a district court's determinations of law *de novo* and its findings of fact for clear error. *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019). "Under clear error review, we will not disturb the district court's findings unless we are left with a definite and firm conviction that a mistake was made." *United States v. Delva*, 922 F.3d 1228, 1255 (11th Cir. 2019).

On appeal, Green challenges the district court's imposition of three enhancements under the Sentencing Guidelines. Specifically, he argues that the district court clearly erred when it applied a four-level enhancement under § 2K2.1(b)(6)(B) for use or possession of a firearm in connection with another felony offense, a two-level enhancement under § 2K2.1(b)(4) for possession of a stolen firearm, and a two-level enhancement under § 3C1.1for obstruction of justice.

As we explain below, the district court correctly applied the § 2K2.1(b)(4) enhancement for possession of a stolen firearm. But the district court erred when it applied the § 2K2.1(b)(6)(B)

enhancement for using a firearm in connection with another felony offense and the § 3C1.1 enhancement for obstruction of justice.

> 1.    *The district court did not err in applying the § 2K2.1(b)(4) enhancement for possession of a stolen firearm.*

We begin with whether the district court erred when it imposed a two-level enhancement under § 2K2.1(b)(4) for possession of a stolen firearm. We review a district court's finding that a firearm was stolen for clear error. *United States v. Holden*, 61 F.3d 858, 859 (11th Cir. 1995). We conclude that the district court did not clearly err.

On appeal, Green argues that the district court clearly erred because the government introduced no evidence that the firearm was stolen. He acknowledges that the record included a police report showing that the firearm was stolen in June or July of 2017, which was before he possessed it. But he says that the government failed to carry its burden because the owner of the firearm did not report the firearm stolen until June 2018, which was after he possessed the firearm.

Based on the police report, the district court could find by a preponderance of the evidence that the firearm had been stolen before Green possessed it. The police report, which was introduced as evidence at the sentencing hearing, shows on its face that the owner of the firearm said that the firearm was stolen several months before Green possessed it. And the district court could rely on the report because Green himself presented the report to the court. See *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004)

(recognizing that the district court's factual findings at sentencing "may be based on, among other things, evidence heard during trial, undisputed statements in the [presentence investigation report], or evidence presented during the sentencing hearing"). Thus, we conclude the district court did not clearly err in imposing the § 2K2.1(b)(4) enhancement for possession of a stolen firearm.

> 2.    *The district court erred when it applied the § 2K2.1(b)(6)(B) enhancement for use or possession of a firearm in connection with another felony offense.*

We next consider whether the district court clearly erred by imposing a four-level enhancement under § 2K2.1(b)(6)(B) for use or possession of a firearm in connection with another felony offense. Section 2K2.1(b)(6)(B) provides for a four-level increase in offense level if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B). We review a district court's finding that a defendant possessed a gun in connection with another felony offense for clear error. *United States v. Martinez*, 964 F.3d 1329, 1333 (11th Cir. 2020). We conclude that the district court's imposition of the § 2K2.1(b)(6)(B) enhancement was clear error.

On appeal, Green argues the district court clearly erred in imposing the § 2K2.1(b)(6)(B) enhancement because the government offered no evidence to prove that he committed the offense of aggravated assault. He says that the government's assertion at sentencing that Green had been charged with aggravated assault in

state court was insufficient to discharge its burden to overcome his objection. Finally, he points out that the district court made no factual findings as to whether he committed an aggravated assault with the firearm in question.

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (internal quotation marks omitted). The government's bare assertions at sentencing, without more, cannot satisfy this burden. *See id.* ("[A]bsent a stipulation or agreement between the parties, an attorney's factual assertions at a sentencing hearing do not constitute evidence that a district court can rely on.").

"[T]o facilitate appellate review, a district court should make explicit factual findings that underpin its sentencing decision." *United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011). These factual findings may be "based on undisputed statements in the [presentence investigation report], but may not rely on those portions to which the defendant objected with specificity and clarity, unless the Government establishes the disputed facts by a preponderance of the evidence." *United States v. McCloud*, 818 F.3d 591, 595 (11th Cir. 2016) (internal quotation marks omitted). But we will nonetheless uphold a sentence "if the record supports the court's determination." *United States v. Daniels*, 685 F.3d 1237, 1253 (11th Cir. 2012) (alteration adopted) (internal quotation marks omitted).

Here, Green objected to the PSR's factual basis for applying the § 2K2.1(b)(6)(B) enhancement. This triggered the government's burden to "introduc[e] sufficient and reliable evidence to prove the necessary facts [for the enhancement] by a preponderance of the evidence." *Washington*, 714 F.3d at 1361 (internal quotation marks omitted).

The government failed to do so. At sentencing, the government represented that Green had been charged with aggravated assault in state court in connection with the same firearm. But this representation was nothing more than an "attorney's factual assertion[] at a sentencing hearing," which, we have made clear, does "not constitute evidence that a district court can rely on." *Id.* Therefore, the government failed to carry its burden to prove the factual basis of the § 2K2.1(b)(6)(B) enhancement.

The government resists this view and argues that we should affirm the district court's imposition of this enhancement because Green admitted to shooting Olson, and the district court "chose not to credit Green's bare assertion that the shooting was in self-defense." Appellee's Br. 45. Specifically, the government points to Green's statement to the court at the pretrial hearing that "I shot [Olson], yes, in self-defense" as the factual basis for the court's imposition of this enhancement. Doc. 292 at 10.

The statement cannot be read as an admission by Green that he committed a felony. In the same statement, he said that he shot Olson in self-defense. Under Georgia law, a defendant is not guilty of aggravated assault if he was acting in self-defense. *See Gold v.*

*State*, 902 S.E.2d 593, 596 (Ga. 2024) (agreeing with the trial court's jury instruction in an aggravated assault case that "a defendant is justified in using force that is intended or likely to cause death or serious bodily injury when he reasonably believes that the use of such force is necessary to prevent a death or serious bodily injury to himself or the commission of a forcible felony" (alteration adopted) (internal quotation marks omitted)). And "the State has the burden of proving beyond a reasonable doubt that the Defendant's actions were not justified." *Id.* (alteration adopted) (internal quotation marks omitted).

Indeed, there was no mention of Green's statement from the pretrial conference at the sentencing hearing. There, the government's sole support for the enhancement's applicability was its verbal assertion that Green had been indicted in Georgia state court for aggravated assault. And at the sentencing hearing the district court made no mention of Green's statement, nor did the court include it in the statement of reasons.

Therefore, the district court clearly erred when it applied the § 2K2.1(b)(6)(B) enhancement for use or possession of a firearm in connection with another felony offense without a sufficient factual basis.

> 3. *The district court erred when it applied the § 3C1.1 enhancement for obstruction of justice.*

This issue requires us to consider whether the district court erred by imposing a two-level enhancement under § 3C1.1 for obstruction of justice. Both parties agree that the district court erred

in imposing this enhancement. But we must still review the district court's conclusion because the government's concession does not bind us to the extent the concession is one of law or is unsupported by the record. *See United States v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021) (explaining that we are not bound by a party's concession of law); *United States v. Linville*, 228 F.3d 1330, 1331 n.2 (11th Cir. 2000) (noting that we are not required to accept a concession "when the law and record do not justify it").

We turn to whether the record supports the government's concession that there was not sufficient evidence of obstructive conduct offered at the sentencing hearing following Green's objection.

Section 3C1.1 provides for a two-level increase in offense level if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. We review the district court's factual findings underlying a sentencing enhancement for obstruction of justice for clear error and review the district court's application of the factual findings to the Sentencing Guidelines *de novo*. *United States v. Watts*, 896 F.3d 1245, 1254 (11th Cir. 2018).

On appeal, Green contends that the district court erred when it imposed the § 3C1.1 enhancement because the government failed to introduce evidence supporting the enhancement after Green objected to the PSR's factual basis for the enhancement. And he argues the district court erred when it failed to make factual findings in overruling his objections.

We agree. The district court's imposition of the § 3C1.1 enhancement shares similar defects with its imposition of the § 2K2.1(b)(6)(B) enhancement. After Green objected to the PSR's factual basis for the § 3C1.1 enhancement, the government asserted at the sentencing hearing that there was bodycam footage recording a witness describing Green's threat. But this was nothing more than a "factual assertion[] at a sentencing hearing" that does "not constitute evidence that a district court can rely on." *Washington*, 714 F.3d at 1361. Thus, the government failed to "introduc[e] sufficient and reliable evidence" supporting the imposition of the obstruction enhancement. *Id.* (internal quotation marks omitted). And the district court failed to make factual findings supporting the enhancement. Instead, it adopted the PSR without change despite Green's objections. Because the record does not support the § 3C1.1 enhancement, the district court clearly erred when it imposed the enhancement to Green's offense level.

To sum up, on Green's sentencing challenges we conclude that the district court erred in applying the four-level enhancement for using a firearm in connection with another felony and the two-level enhancement for obstruction of justice. The government

suggests that remand is not warranted because the district court's error was harmless: Green's guidelines range still would have been the statutory maximum of 120 months. But without these enhancements, Green's total offense level would have been 22 and his guidelines range would have been 84 to 105 months. We thus cannot say that any error was harmless.

### III.    CONCLUSION

For the reasons set forth above, we affirm Green's conviction. But we vacate his sentence and remand for resentencing in a manner consistent with this opinion.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**